[655 NYS2d 750]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MURALI KRISHNA PONNAPULA, Respondent.

First Department, March 18, 1997

APPEARANCES OF COUNSEL

*Penny Rosenberg* of counsel *(Rona Feinberg* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for appellant.

*Alexander E. Eisemann* for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

This appeal is from the vacatur, for insufficiency of evidence, of a jury verdict convicting defendant of grand larceny in the first degree and falsifying business records in the first degree and dismissal of the indictment charging him with the commission of those crimes. Defendant's conviction arose out of his actions in furtherance of a fraud to obtain a $1.9 million loan from the Bank of India.

The evidence at trial revealed the following. Dr. Ponnapula Sanjeer Prasad, defendant's brother, was the owner and principal of a group known as the Prasad Organization, located in Greenville, North Carolina, the primary function of which was to purchase hotels for quick resale at a profit. Its other members included defendant; another brother, Pasha Ponnapula; Vijay Dandapani, Prasad's first assistant; Mahesh Shetty, the organization's chief financial officer; Pat White, Dandapani's assistant, and Norma Doty, the office manager. Defendant, who lived in Tennessee, operated three of the organization's hotels and, through two construction companies he owned and operated, renovated others. Defendant was on the organization's payroll and received compensation irrespective of whether renovations were performed.

Between the fall of 1989 and July of 1990, Prasad, Dandapani, Shetty and White prepared false documentation to obtain approximately 12 loans from six banks, including loans for $3 million, $4 million and $1.9 million from the Bank of India, and a $14 million loan from the Bank of Credit and Commerce International (BCCI). Since only the $1.9 million loan from the Bank of India is the subject of this indictment, evidence as to the other three loans was permitted as necessary background. There was also testimony offered as to a $1.4 million loan from the State Bank of India and a $2.5 million loan from Branch Banking and Trust. Evidence as to the two latter loans, which were unrelated to the other charges contained in the indictment, was permitted pursuant to a pretrial *Molineux* ruling. To implement their scheme, these four

individuals would alter documents, use forged or fictitious signatures and offer false information, where necessary, to obtain the loans.

In November 1988, the Bank of India authorized a $3 million loan to P.S. Investment Company (P.S.), the Prasad Organization's main operating entity, for the purchase of the Ramada Inn in Chattanooga, Tennessee. Repayment of this loan was later made a condition of a subsequent Prasad Organization application for a $4 million loan to purchase the East Ridge Days Inn in Chattanooga.

In 1989, Prasad decided to purchase a hotel and adjacent parking lot near LaGuardia Airport in New York City and in September of that year met with Shahbaz Raheem, BCCI's chief credit officer, to whom Prasad paid bribes to provide bank references and process and expedite loan applications, to discuss a loan to enable the organization to purchase and renovate the LaGuardia Airport property.[1] Raheem promised to get bank approval for a $14 million loan using the hotel alone as security and suggested that, after the purchase, Prasad legally sever the parking lot from the hotel premises to enable the organization to borrow against the parking lot at a later date. Prasad was amenable and noted that he could use Hospitality Realty Corporation (HRC)—a shell corporation created on April 18, 1989 by the Prasad Organization for future acquisitions—to borrow against the parking lot. HRC was completely separate from the Zurich Corporation, which, in early 1989, had replaced P.S. as the organization's main operating entity and which, by the latter part of 1989, had accrued a substantial amount of debt.

Raheem helped Prasad structure an acceptable proposal from Zurich to BCCI, based on information that was inaccurate, for the purchase and renovation of the LaGuardia Airport property. As part of the application, Dandapani prepared a false statement regarding Prasad's finances, instructed White to alter the purchase agreement to reflect a higher purchase price for the property and had Shetty prepare a false projected income statement for the hotel.[2]

In October 1989, the Prasad Organization applied to the Bank of India for a $4.5 million loan to Zurich to purchase the

1. As a result of his involvement with the Prasad Organization, Raheem pleaded guilty to commercial bribe receiving in the first degree. At trial, he testified for the prosecution under a cooperation agreement.

2. Dandapani pleaded guilty to larceny in the first degree and, pursuant to a cooperation agreement with the New York County District Attorney, testified for the prosecution at defendant's trial.

East Ridge Days Inn in Chattanooga. In the loan application, Dandapani included a false $7.4 million appraisal of the property and a highly inflated financial statement as to Zurich. He also listed defendant and Majestic Construction, one of defendant's construction companies, as major suppliers of Zurich. In fact, defendant was not a supplier but, according to Dandapani, was expected, if asked, to respond that he was. In its commitment letter of February 15, 1990, the Bank of India agreed to advance $4 million for the purchase of the East Ridge Days Inn, conditioned upon the repayment before closing of the existing $3 million loan for the purchase of the Ramada Inn in Chattanooga.

On January 19, 1990, about a month before receipt of the Bank of India's commitment letter for the $4 million East Ridge Days Inn loan, Zurich closed on the $14 million BCCI loan and purchase of the LaGuardia Airport property. At the closing, which Dandapani and Shetty attended, $10 million was disbursed and both the hotel and parking lot were conveyed to Zurich; the parking lot was then transferred, without consideration, to HRC. The remaining $4 million was disbursed in progressive payments based on the submission to the bank of checks drawn on the Prasad Organization's accounts for renovation of the property. Fictitious checks, some written to Majestic Construction, defendant's company, were submitted to exaggerate the extent of the renovations. Shortly after the LaGuardia Airport loan closing, Dandapani told defendant that although HRC owned the parking lot, a professional parking company was operating it. When defendant asked "why don't we run it ourselves", Dandapani said he and Prasad would consider it. As noted, all of this evidence, including the three loans, was offered as background information regarding the $1.9 million loan from the Bank of India, which formed the basis of defendant's indictment.

Immediately after the January 19, 1990 transfer of the LaGuardia Airport parking lot to HRC, Prasad began the process of obtaining another loan, using the parking lot as security. Prasad, his companies heavily in debt, decided to make it appear as though he was not involved in the loan. Thus, the loan was sought on behalf of HRC, of which defendant was made president in February 1990. It was felt that defendant, the owner of two companies, would be able, as Dandapani testified, to "field" any questions the bank might have. Significantly, on the loan documents, defendant's name appeared as Murali Krishna rather than Murali Krishna Ponnapula.

In the loan application, Dandapani, who supervised the process for the organization, listed defendant as president and 100% stockholder of HRC and falsely stated that HRC had 15 employees, three suppliers, two bank references and several credit facilities, including one for $450,000 from BCCI. Shetty prepared a false financial statement for defendant, on which Dandapani forged his signature. White prepared a fictitious appraisal of the property. The bank was advised that the purpose of the loan was the purchase of the parking lot, which, in fact, HRC already owned. The loan application, however, unintentionally included the fact that HRC was the current owner of the parking lot.

At about the time the loan documents were submitted to the bank, Dandapani informed defendant that, as far as the bank was concerned, the loan was intended to purchase the parking lot; that a financial statement had been submitted to the bank on defendant's behalf, although the contents thereof were not disclosed to him; that defendant had been depicted as president and owner of HRC and that his name appeared on the loan documents as Murali Krishna so as to avoid any connection between defendant and his brother, Ponnapula S. Prasad. Dandapani informed defendant that he should expect inquiries from the bank.

An officer at the Bank of India reviewed the loan application and wrote to HRC on February 20, 1990 seeking clarification of the purpose of the loan and additional information about defendant's personal financial statement. When asked by Dandapani for the name of a local bank officer who would provide a reference, defendant suggested David Moore of Northwest Georgia Bank. In a meeting with Dandapani, Moore and Pasha Ponnapula, defendant asked Moore, if called upon, to provide a reference. By letter of February 22, 1990, Dandapani informed the Bank of India that the purpose of the loan was the purchase of the parking lot. In another letter that same day, White, in defendant's name, detailed HRC's accounts and added Moore as a bank reference. In a reply to a Bank of India inquiry from BCCI, one of HRC's references, Raheem noted that HRC did not have any credit facilities with the bank but that Zurich, a related company, did. The bank never contacted defendant personally with respect to the loan and took no action to confirm the appraisal of the property or defendant's financial status.

Jagdish Pai, the Bank of India officer handling the loan application, recommended approval based on a "package of fac-

tors", including defendant's alleged $2 million net worth; his status as the guarantor of the loan; his position as president of HRC; and HRC's alleged experience in acquiring and renovating hotels. As the record reveals, that recommendation would not have been made if HRC had not been in the business of acquiring or renovating hotels and defendant had not been worth $2 million and willing to guarantee the loan.

Dandapani arranged for defendant's presence at the loan closing and, as they waited for the bank's attorney, reminded defendant that the closing was for the $1.9 million loan from the Bank of India for the parking lot and that he would be presented with documents to sign. Dandapani also informed defendant that the proceeds, which might be used to build a multitiered parking garage, were being sent to HRC's account in Greenville.

The bank's attorney, meeting defendant for the first time, requested photographic identification from both defendant and Dandapani. Defendant provided a driver's license in the name of Murali Krishna Ponnapula. The bank's attorney handed defendant one document at a time, explaining what it was, and observed defendant sign four copies of each. According to Dandapani, defendant looked at the documents but did not read them. As president of HRC, he signed a term loan agreement stating that the loan was to be used for the cost of operating the parking lot; a promissory note; an assignment of a contract; a letter of undertaking and a letter directing that the loan proceeds be disbursed to the HRC account in Greenville. Defendant also signed, in his individual capacity, a $1.9 million guaranty and executed an affidavit confirming that he was the president of HRC and was familiar with the property. The loan proceeds were disbursed, in accordance with the closing arrangements, to the HRC account in Greenville. Instead of being used to purchase or operate the parking lot, the proceeds were transferred to Zurich's account.

After being transferred to Zurich's account, the $1.9 million was used to cover a check, dated March 22, 1990, to the Bank of India in repayment of the $3 million loan used to purchase the Ramada Inn in Chattanooga, the repayment of which, as noted, was a condition to the bank's extending a $4 million loan for the purchase of the East Ridge Days Inn in Chattanooga. In the middle of March 1990, after repayment of the $3 million loan, the Bank of India closed on the $4 million East Ridge Days Inn loan, disbursing the proceeds to the Prasad Organization.

Toward the end of 1990, HRC fell behind in its interest payments on the $1.9 million loan. Dandapani advised defendant to refer any questions about the default to him or Prasad. In a November 1990 letter, Prasad, despite the fact that the necessary resources were not available, informed the bank that he was working with HRC to bring the account current by December 1990. The default continued and, by letter of December 13, 1990, the bank informed defendant that the $1.9 million loan was overdue. On January 10, 1991, Prasad wrote, seeking to restructure the $4 million East Ridge Days Inn loan, and advising the bank that he was assuming responsibility for HRC's $1.9 million debt. Soon after, Prasad left for India; he has not returned.

Despite the problems with the repayment of the $1.9 million loan and a $1.4 million loan which had gone into default in September 1991, defendant sought Raheem's assistance in obtaining financing for the construction of a hotel on the LaGuardia Airport parking lot. When Raheem, who had thought that a multitiered garage was to be built on the site, expressed surprise, defendant told him that since he owned HRC, the decision was technically his and that he would take care of Prasad.

Between December 1991 and May 1992, the Bank of India officer assigned the responsibility of collecting the $1.9 million loan spoke four or five times with defendant, who assured him that he was making arrangements to pay the interest and develop a program to repay the principal. Between January and May 1992, after litigation on the account had already been commenced, three or four payments totalling $40,000 were made. Dandapani's efforts to restructure the loan failed, as well as a plan by defendant's brother, Pasha, to bring in an equity partner who would assume personal liability. The $1.9 million Bank of India loan, although secured by a first lien on the parking lot, appraised at $3.27 million, was never repaid.

Two years earlier, in April 1990, the Prasad Organization had sought a $1.4 million loan from the State Bank of India to purchase a Days Inn at Memphis Airport. The contract of sale, entered into by Dandapani on behalf of Zurich, already substantially in debt, was assigned on April 20, 1990 to HRC, which, in support of the loan, misrepresented in documents submitted to the bank that it had 15 employees; that defendant, one of five partners involved in the transaction, owned 20% of HRC; that HRC had a $500,000 cash balance and that the purchase price was $1.8 million. The bank agreed to a $1.4

million loan, which closed in May 1990, on condition that HRC's five stockholders provide personal guarantees. Dandapani provided the guarantees, including one bearing defendant's name, which Dandapani had forged, and another signed by defendant's brother, Pasha Ponnapula, in his own behalf. Dandapani told Pasha to inform defendant of his signing the guaranty on defendant's behalf. Prasad paid defendant a commission for locating the hotel and helping to secure the loan, which was never repaid. Eventually, the bank sued the guarantors for repayment. In March 1991, when Dandapani reminded defendant that he was a guarantor, defendant told him not to worry, that he and Prasad would "take care" of it.

The Prasad Organization, also in April 1990, applied to Branch Banking & Trust, a North Carolina bank, for a $2.5 million loan on behalf of Cox Trailers, another of the organization's businesses. The bank agreed to the loan, subject to an acceptable environmental report from a professional firm and environmental site inspection of the property that was to be used to secure the loan. When the professional firm commissioned to conduct the inspection and prepare a report reached findings that would have been unacceptable to the bank, Prasad and Dandapani called defendant to advise him of the problem. Defendant suggested that his assistant, Bob Price, could prepare a report acceptable to the bank. Price, in turn, told Dandapani that he "could fashion a report that * * * would pass muster with the bank." Dandapani reminded defendant that the matter was urgent.

Some days later, Price prepared a fabricated report under a name, Edwards Environmental, Incorporated, agreed to by Dandapani, Prasad and defendant, using as an address defendant's headquarters at the Chattanooga Days Inn. Edwards was the name of one of defendant's former associates. Even with the false Edwards' report, the bank still had reservations about soil contamination. When Dandapani called defendant to advise him of the report's inadequacy, defendant gave the phone to Price, who was asked to provide an additional report. A few days later, Price sent a second report that was acceptable to the bank.

When the State Bank of India officer assigned to collect the $1.4 million loan for the Days Inn at Memphis Airport, in default since September 1991, contacted defendant in early January 1992 and reminded him of his guaranty, defendant did not deny signing the guaranty, although, as noted, Dandapani had forged his signature. Instead, he asked to see the

guaranty. After receiving the guaranty, he sent the bank a proposal for the management of the property, which was rejected. Evidence of the unrelated $1.4 million loan from the State Bank of India for the purchase of the Days Inn at Memphis Airport and defendant's default thereon as well as the $2.5 million Cox Trailers loan from Branch Banking & Trust was introduced, in accordance with a pretrial ruling, to demonstrate defendant's fraudulent intent and knowledge.

Defendant's case consisted of the admission of several checks and a stipulation relative to defendant's efforts to restructure the defaulted $1.9 million Bank of India loan. At the close of the People's case, the court reserved decision on defendant's motion to dismiss the case for insufficiency of evidence, which motion defendant renewed after the verdict, arguing, *inter alia*, that the evidence failed to show that he knew of any false statements to the Bank of India or that the bank relied on the alleged misrepresentations. The People argued that the evidence established that defendant had knowledge of the false representations made to the bank and that he made a false promise when he signed a guaranty he never intended to honor.

■ In its decision granting the motion, the trial court, contrasting the overwhelming evidence against Prasad, Dandapani and Shetty with the "pale case" presented against defendant, found that the People failed to present any evidence of defendant's participation in the submission of false statements in the $1.9 million loan application or of his knowledge that the documents contained false representations. Thus, it held, defendant's guilt of larceny by false pretenses was not established. Similarly, the trial court found, as to the theory of false promise, that the People failed to establish that defendant knew what the guaranty meant or what its provisions required of him. Even if such a showing had been made, the court held, the People failed to show that defendant signed the guaranty pursuant to a scheme to defraud. Finally, the court held that, given the failure of proof with respect to defendant's knowledge of the false statements contained in the loan documents and the requisite intent to sustain the larceny conviction, defendant's guilt of falsifying business records could not stand since it was based on defendant's execution of the same loan documents. The order setting aside the verdict should be reversed and the verdict reinstated.

A trial court's power to set aside a verdict is "far more limited" than that granted to an intermediate appellate court on direct appeal. (*People v Carter*, 63 NY2d 530, 536.) CPL

330.30 (1) authorizes a trial court to set aside or modify a verdict only in the case of error, which, "if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court." (*See, People v Carter, supra,* 63 NY2d, at 536.) Thus, defendant's conviction could be set aside at the trial level only on the basis of insufficient evidence or evidence which, as a matter of law, was inadequate to prove guilt beyond a reasonable doubt. (*Supra,* at 537.)

The trial court's concern with the quantum and quality of the evidence presented against defendant as compared with that against others more culpable suggests an interest of justice rationale, which is not a basis upon which a trial court can set aside a verdict. (*Supra; see, People v Carthrens,* 182 AD2d 460.) Nor should it be surprising that there was far more evidence against Prasad, the group's ringleader, who was, in the same indictment, charged with 70 counts. The issue was never, and is not now, comparative guilt but, rather, whether the People presented sufficient evidence of guilt as to the charges of which defendant was convicted.

The standard of review in determining the legal sufficiency of evidence to support a guilty verdict is well known—whether the evidence, viewed in the light most favorable to the People, could lead a rational trier of the facts to conclude that the elements of the crime had been proved beyond a reasonable doubt. (*People v Cabey,* 85 NY2d 417, 420; *People v Acosta,* 80 NY2d 665, 672.) The evidence presented here, measured by this standard, plainly established defendant's guilt.

A person commits larceny by false pretenses when, with the intent to deprive the owner of its property, he or she intentionally makes a false representation of a material fact upon which the owner relies in parting with his property. (Penal Law § 155.05 [2] [a]; *People v Norman,* 85 NY2d 609, 619; *see also, People v Chaitin,* 94 AD2d 705, 706, *affd* 61 NY2d 683.) Larceny by false promise is committed when, "pursuant to a scheme to defraud, [a person] obtains property of another by means of a representation, express or implied, that he * * * will in the future engage in particular conduct, and when he does not intend to engage in such conduct". (Penal Law § 155.05 [2] [d].) The inference of criminal intent may not be drawn solely from the fact that the defendant's promise was not performed. (*Ibid.*) As the statute expressly provides, a finding of intent "may be based only upon evidence establishing that the facts and circumstances of the case are wholly consistent with guilty intent

or belief and wholly inconsistent with innocent intent or belief, and excluding to a moral certainty every hypothesis except that of the defendant's intention or belief that the promise would not be performed". (*Ibid.*) Thus, the evidentiary standard tracks the burden in cases involving proof that is wholly circumstantial. (*People v Norman, supra*, 85 NY2d, at 619-620.) On appellate review, the inquiry is limited to whether there is any valid line of reasoning that could lead a rational trier of fact, viewing the evidence in the light most favorable to the People, to conclude that the defendant, pursuant to a scheme to defraud, acted with the requisite guilty intent.

In the instant matter, the evidence established that defendant knew of or participated in a number of the misrepresentations relied upon by the Bank of India in making its decision to extend the $1.9 million loan to HRC for the LaGuardia Airport parking lot. Defendant knew that Dandapani had misrepresented to the bank that defendant was HRC's owner, that the purpose of the loan was to acquire the parking lot and that defendant had the financial ability to guarantee the loan. Defendant also signed all the loan documents as Murali Krishna, knowing that his last name had been left off the loan application to conceal his relationship with his brother, Prasad. Finally, defendant misrepresented that he personally intended to repay the loan if HRC defaulted.

As the evidence shows, Dandapani told defendant that he had represented to the bank that defendant was the president and owner of HRC, while, in point of fact, defendant knew that Prasad, not he, was the owner of HRC. As defendant well knew, he had no control over HRC as president, owner or otherwise. He could not dictate where the loan proceeds would go or decide the future use of the parking lot or make any of the decisions on behalf of HRC. When defendant wanted to participate in the construction of the proposed multitiered garage at the parking lot property, he had to seek permission and accepted Dandapani's response that he would discuss the matter with Prasad. Similarly, when defendant wanted a loan to improve the parking lot, he approached Raheem, who made it clear that Prasad would have to be consulted. Defendant recognized this fact when he responded that he would "take care of" Prasad, even referring to himself as the "technical" owner of the property. Thus, in light of defendant's inability to make decisions on behalf of HRC or to control the property it nominally owned or to decide how the loan proceeds would be used, it is clear that he was not the true owner or president of

HRC and that, in signing the loan documents as such, knowing that Dandapani had falsely represented to the bank that he was the president and owner, defendant knew he was perpetrating a fraud.

The trial court's finding that defendant did not falsely represent that he was the president of HRC since he performed the functions of president when he had his local bank submit a reference on his behalf and when he attended the closing and signed documents misses the point and ignores the fact that defendant knew he had been misrepresented to be both president and owner of HRC. Indeed, by these acts, defendant was able to convince the bank that he was the president and owner of HRC and perpetrate the fraud initiated by his brother. In point of fact, the evidence showed that Prasad, the only person to exercise any control over HRC, was using defendant in his scheme and that defendant was quite aware of that fact and was a willing participant.

In that same vein, by omitting the name Ponnapula from his signature on all of the loan documents, defendant knowingly concealed the fact that he was Prasad's brother and his connection with the organization. When Prasad sought the $1.9 million parking lot loan, he knew that the organization was overextended and, for that reason, sought the loan on behalf of HRC, a separate entity and one not readily identified with the Prasad Organization. Toward that end, Prasad had already made defendant its president. Defendant knew that the concealment of his relationship with Prasad was critical since Dandapani had told him that his last name had been omitted from the loan documents to conceal the relationship. And, when he attended the closing and signed four duplicates of each of the voluminous closing documents using the name Murali Krishna instead of Murali Krishna Ponnapula, he knowingly misrepresented a fact that was material and upon which the bank, in approving the loan, would rely.

That, as defendant argues, the bank had been advised, prior to the loan approval, that HRC and Zurich were related companies does not detract from the materiality of the misrepresentation as to defendant's name. This is especially so given defendant's false representations as to his role in HRC and his financial stability as well as his tender of a personal guaranty. Nor does the fact that defendant did not, on other occasions, use his last name negate the inference of the fraudulent purpose behind that omission here. Equally insignificant is the fact that defendant's local bank sent a letter of reference on

his behalf that included the name Ponnapula, a matter over which defendant had no control. Similarly inconsequential was defendant's display of his driver's license containing his full name when, at the closing, the bank's attorney specifically requested a photo identification, a request with which defendant had no choice but to comply. In any event, since the closing attorney had no reason to know about the bank's previous Prasad Organization loans, the name Ponnapula would hardly have had any significance to him. Moreover, by the time the bank saw any papers containing defendant's last name, the loan had already been approved. Significantly, that defendant used his full name at his local bank and on his driver's license is persuasive evidence that in matters of importance he did use his last name. His failure to do so here strongly suggests that the omission was intentional. Thus, contrary to the trial court's finding, the jury's conclusion that defendant was aware of the misrepresentation as to his name and the purpose of the misrepresentation was reasonable (*see, People v Cabey, supra,* 85 NY2d, at 420; *People v Acosta, supra,* 80 NY2d, at 672) and affords no basis to set aside the verdict and dismiss the indictment.

The trial evidence was also sufficient to prove beyond a reasonable doubt that defendant knew that the bank had been told that the purpose of the loan was to acquire the parking lot, which, as defendant well knew, HRC, the borrower, already owned. As Dandapani testified, he explicitly told defendant that the bank had been so informed. That the papers submitted to the bank stated that HRC currently owned the lot does not alter the fact that defendant made efforts to obtain the loan while believing that its purpose had been misrepresented to the bank. And, as noted, Dandapani informed the bank in a February 22, 1990 letter that the purpose of the loan was to purchase the parking lot.

It is also clear from this record that defendant, although promising otherwise in his written guaranty, never intended to be personally responsible for the $1.9 million loan. As the evidence shows, defendant knew not only that he was signing a personal guaranty but also, as an experienced businessman, its legal implications. The bank attorney explained to defendant, as he handed him each document to be signed, what the particular document represented. Moreover, the guaranty in question, four duplicates of which were signed, was clearly marked, "Guaranty" at the top of the first page. Obviously, by the document's title alone, defendant had to understand that he

was guaranteeing repayment of the loan in the event of default. The document, one of only two that defendant signed in his individual capacity and not as president of HRC, clearly listed defendant as the guarantor.

The evidence is also clear that, at the time he signed the guaranty, defendant had no intention of being personally responsible for the loan's repayment. He not only lacked the resources to repay a loan of such magnitude but, more important, he knew that the loan proceeds were not intended for him, but rather were for Prasad, who would decide how to use the money as well as the future of the parking lot and, for that matter, HRC. In such circumstances, the jury was well justified in determining that defendant fully expected that Prasad, not he, would be responsible for the loan. While, as the trial court found, defendant may not have had reason to believe that he would actually be held personally responsible for the loan, it is fairly inferable from the evidence that when defendant signed the guaranty promising, in the event of default, to repay the loan, he did not have the slightest intention of fulfilling that promise, even if called upon.

Significantly, when the loan became due, defendant completely ignored the default notices for months. Rather than attempt to repay the loan, he was trying to obtain funds from Raheem at BCCI to improve the parking lot. Not until suit was commenced on the defaulted loan did defendant speak to a bank representative about it. In that regard, defendant's suggestions had nothing to do with honoring his guaranty, but, rather, with restricting the loan, extending it or getting someone else to repay it. And, when push came to shove, it was defendant's brother, Pasha, not defendant, who tried to negotiate with respect to the default. Thus, the jury could reasonably conclude that defendant signed the guaranty merely because it was required, not because he ever truly intended to repay the loan.

Moreover, defendant knew, because Dandapani had told him, that a financial statement had been submitted to the bank on his behalf. While he had never been told of its details, he had to have known that it was not accurate since he did not have the means to guarantee a $1.9 million loan. As an experienced businessman, he would know that the financial statement exaggerated his financial means since the bank, on the basis of the statement, would never have accepted his guaranty unless it believed him financially capable of repaying the loan.

Thus, while the trial court's decision setting aside the verdict and dismissing the indictment is rife with the suggestion that

defendant was an unknowing dupe in the Prasad Organization's scheme to defraud the bank, the evidence is to the contrary. Defendant managed several of the organization's hotels, did the renovating on its properties and managed two of his own businesses. As the evidence shows, rather than the unwitting dupe, he was the designated borrower on the $1.9 million loan precisely because he would be able to "field" the bank's questions. Moreover, the record reveals defendant to be an intelligent and capable businessman who understood the purpose and consequence of each of the misrepresentations made with his knowledge and who was aware that he was assisting his brother in a fraudulent scheme to obtain a $1.9 million loan from the Bank of India. Indeed, although his name had been used without his prior knowledge as one of the five guarantors of the subsequent $1.4 million Memphis Airport Days Inn loan, defendant accepted responsibility when the bank contacted him about the guaranty after his brother, Pasha, had told him that a guaranty had been signed on his behalf. As this incident shows, Prasad could count on defendant, when needed, to cover for him. Furthermore, on the question of his knowledge, the record shows that defendant aided the Prasad Organization in creating a false environmental report in order to obtain the $2.5 million Cox Trailers loan from Branch Banking & Trust.

Thus, the record shows that defendant was aware of the false representations made by him or on his behalf and that with such knowledge he performed key functions in furtherance of the fraud. The evidence further demonstrated that the bank relied on these misrepresentations. While Pai, the bank officer, in approving the loan, relied on a "package of factors", it is clear that defendant's ownership and presidency of HRC were determinative. Had the Prasad Organization's interest in the loan been disclosed, the bank would never have approved it. Similarly, Pai relied on defendant's reputed net worth and personal guaranty, which were critical.

■ Defendant also claims that it cannot be determined whether the jury convicted him under a theory of larceny by false pretenses or larceny by false promise. Thus, he argues, even if we were to conclude that an evidentiary basis existed for the jury's verdict finding him guilty of larceny by false pretenses, the matter must be remanded for a new trial unless the People can also establish a basis for a conviction on a theory of larceny by false promise. Although the People need prove only that the defendant wrongfully took property, the evidence, in our view, established defendant's guilt of grand larceny by both false pretenses and false promise.

Subdivision (1) of Penal Law § 155.05 sets forth the general definition of larceny for all degrees of the crime while subdivision (2) enumerates, at a minimum, five different ways in which the crime may be committed, including by false pretenses and by false promise. These different forms of larceny are not alternatives to larceny as defined in subdivision (1) but, rather, subsumed in the definition. Thus, whether viewed as having been committed by false pretenses or false promise, the larceny of which defendant was convicted constitutes only one offense.

Indeed, except where the theft was from the person or by extortion, the People need not disclose "the particular way or manner in which [the] property was stolen or the particular theory of larceny" on which they rely. (Penal Law § 155.45 [1].) The Penal Law " 'permit[s] conviction upon pleading and proof charging and establishing "larceny" in its broadly defined form regardless of the basic common law offense underlying the particular case.' " (Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law art 155, at 98, quoting Commn Staff Notes, reprinted in Proposed New York Penal Law [Study Bill, 1964 Senate Int 3918, Assembly Int 5376], at 351.) "[P]roof that defendant engaged in any conduct constituting larceny, as broadly defined, is generally sufficient." (Id., at 104; see, People v Kaminsky, 127 Misc 2d 497, 504.)

Thus, contrary to defendant's suggestion, there need not be juror unanimity as to the particular method by which the larceny was committed, any more than there need be, for instance, as to the particular type of force used in a robbery or rape. A prosecutor is required to allege and prove no more than that the defendant wrongfully took property. In United States v Garcia (992 F2d 409, 416 [2d Cir]), the court, relying on Griffin v United States (502 US 46, 59-60), held that when disjunctive theories of criminality are submitted to the jury and a general verdict of guilt is rendered, a challenge based on evidentiary insufficiency will be rejected as long as there was sufficient evidence to support any of the theories submitted; on the other hand, a challenge based on legal insufficiency will be sustained if any of the theories was legally insufficient. Since, in the instant matter, the challenge to the verdict is an evidentiary one and since the evidence supports one or both theories, the verdict is unassailable.

The same evidence which proved defendant's guilt of grand larceny in the first degree also established defendant's guilt of falsifying business records in the first degree, committed when one, who, with intent to defraud in order to commit another

crime, makes or causes a false entry in the business records of an enterprise (Penal Law § 175.10). As noted, the records show that defendant participated in a larcenous scheme to defraud the Bank of India and obtain a $1.9 million loan.

■ The other grounds asserted by defendant to sustain the trial court's determination, although raised on his motion, were never addressed by the trial court, which relied solely on the insufficiency of the evidence, and, thus, may not be advanced now. CPL 470.15 (1), which restricts intermediate appellate courts to a consideration of errors that "may have adversely affected the appellant", bars this Court from considering alternate grounds for affirmance in the present procedural posture. (*People v Karp*, 76 NY2d 1006, 1008-1009; *People v Goodfriend*, 64 NY2d 695, 697-698.) Since this is an appeal by the People, appellate consideration of these other issues raised by defendant "must await a direct appeal by the defendant." (*People v Clausell*, 182 AD2d 132, 137.)

Accordingly, the order of the Supreme Court, New York County (Richard Carruthers, J.), entered July 24, 1995, setting aside the jury verdict finding defendant guilty of grand larceny in the first degree and falsifying business records in the first degree and dismissing the indictment, should be reversed, on the law, the verdict reinstated and the matter remitted to Supreme Court for sentencing.

MURPHY, P. J., ELLERIN, NARDELLI and MAZZARELLI, JJ., concur.

Order, Supreme Court, New York County, entered July 24, 1995, reversed, on the law, the verdict reinstated and the matter remitted to Supreme Court for sentencing.