297 F.3d 172
 Murali Krishna PONNAPULA, Petitioner-Appellant,
v.
Eliot SPITZER, Attorney General of the State of New York; Bernard B. Kerik, Commissioner, New York City Department of Corrections, Respondents-Appellees.
 Docket No. 00-2237.
 United States Court of Appeals, Second Circuit.
 Argued: October 15, 2001.
 Decided: July 26, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Alexander E. Eisemann, New York, NY, for Petitioner-Appellant.
 David J. Mudd, Assistant District Attorney (Robert M. Morgenthau, District Attorney for New York County, and Mark Dwyer, Assistant District Attorney, on the brief), New York, NY, for Respondents-Appellees.
 Before: WALKER, Chief Judge, MESKILL, Circuit Judge, and KOELTL, District Judge.[1]
 JOHN M. WALKER, JR., Chief Judge.
 
 
 1
 Petitioner Murali Krishna Ponnapula appeals from the decision of the United States District Court for the Southern District of New York (Jed S. Rakoff, District Judge) denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After a jury trial in the New York State Supreme Court, New York County, petitioner was convicted of grand larceny in the first degree, in violation of New York Penal Law § 155.42, and falsifying business records in the first degree, in violation of New York Penal Law § 175.10, based on his participation in a scheme to obtain a $1.9 million loan by submitting false documents with the loan application.
 
 
 2
 On appeal, Ponnapula claims that the district court erred in denying his habeas petition because: (1) the evidence was insufficient as to his knowledge and intent to commit larceny; (2) the state court's interpretation of the larceny statute was so unexpected as to violate the fair notice aspect of the Due Process Clause of the Fourteenth Amendment; and (3) the State violated his rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose impeachment and exculpatory evidence.
 
 
 3
 The judgment of the district court is affirmed.
 
 BACKGROUND
 
 4
 Our recitation of the following facts established at petitioner's state trial presents the evidence in the light most favorable to the prosecution. See Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000). Ponnapula played an important role in fraudulently obtaining a $1.9 million loan from the Bank of India ("the Bank"). The scheme was orchestrated by petitioner's brother, Dr. Ponnapula Sanjeeva Prasad. Prasad owned the Prasad Organization, an umbrella organization with several operating entities that purchased hotels for quick resale at a profit. Ponnapula operated three of these hotels and renovated others using his two construction companies. Other employees of the Prasad Organization included Vijay Dandapani, Prasad's first assistant; Mahesh Shetty, the Chief Financial Officer; Pasha Ponnapula ("Pasha"), petitioner's other brother; and Pat White, Dandapani's assistant.
 
 
 5
 To raise cash to purchase hotel properties, Prasad, Dandapani, Shetty, and White prepared a series of fraudulent applications to obtain loans from six different banks, at times channeling the proceeds of one loan to cover the outstanding balance of the other loans. As detailed below, the $1.9 million loan that served as the basis of petitioner's conviction was part of this overall scheme.
 
 I. The $1.9 Million Loan
 
 6
 In 1989, the Prasad Organization's main operating entity, the Zurich Corporation ("Zurich"), used proceeds from a loan that was fraudulently obtained from the Bank of Credit and Commerce International to purchase a hotel and an adjacent parking lot near LaGuardia Airport in Flushing, New York. Later that same year, Zurich applied for a $4 million loan, again using falsified documents, from the Bank of India to purchase a hotel in Tennessee ("$4 million loan").
 
 
 7
 The Bank agreed to lend Zurich the $4 million, but conditioned the disbursement of the proceeds on Zurich first repaying its existing $3 million debt to the Bank. In order to satisfy this requirement, Prasad decided to take out a $1.9 million loan from the Bank using the parking lot near LaGuardia Airport as collateral.
 
 
 8
 Because the $1.9 million loan would push Zurich's credit above the company's limit with the Bank, Prasad took several steps to mask his and Zurich's involvement in the loan application. The loan would be taken out in the name of Hospitality Realty Corporation ("HRC"), a shell corporation of the Prasad Organization that was legally distinct from Zurich. Prasad split the titles of the hotel and the parking lot and, in January 1990, transferred the parking lot from Zurich to HRC. To avoid listing Prasad as a stockholder or officer of HRC, Dandapani and Prasad designated Ponnapula as both one hundred percent stockholder and president of HRC. They chose Ponnapula because he had "a real company" and "had a better ability [than Pasha] to field any questions." Finally, because Prasad's first name is Ponnapula, petitioner's name appeared on the loan application documents as "Murali Krishna," rather than "Murali Krishna Ponnapula."
 
 
 9
 Dandapani, Shetty, and White prepared the loan application package on behalf of HRC, including a false representation about HRC's experience in acquiring and renovating hotels and an inaccurate personal financial statement for Ponnapula that reflected his personal worth to be over $2 million. Dandapani forged petitioner's signature on both the application and the personal financial statement.
 
 
 10
 Dandapani later informed Ponnapula that he was listed as the borrower on the loan but that "it was a Dr. Prasad loan." Dandapani advised Ponnapula that his last name had been omitted from the documents to prevent the Bank from discovering his relationship with Prasad. Furthermore, Dandapani told Ponnapula that a personal financial statement had been submitted on his behalf, but did not tell him that the value of his personal wealth had been exaggerated. Dandapani also warned him that the Bank had been told that the purpose of the loan was to purchase the parking lot, a lot that Ponnapula knew HRC already owned. Finally, Dandapani told Ponnapula to expect calls from the Bank regarding the loan.
 
 
 11
 After the loan application had been submitted, the Bank requested more information with respect to Ponnapula's personal finances. Accordingly, Dandapani and Ponnapula met with Ponnapula's personal banker, David Moore of Northwest Georgia Bank, and requested that he act as a reference. Subsequent to this meeting, Moore sent a reference letter to the Bank on behalf of HRC and Ponnapula.
 
 
 12
 The Bank approved the loan for the purpose of providing working capital for the operation of the parking lot. According to the bank officer who evaluated the loan application, his decision to approve the loan was based on a "package of factors," including petitioner's personal guaranty, his reported personal worth of $2 million, and HRC's alleged activity in renovating and acquiring hotels.
 
 
 13
 After the loan was approved, Ponnapula and Dandapani traveled to New York for the closing. At the closing, Dennis Krasner, an attorney for the Bank, handed Ponnapula documents from the closing binder one at a time and identified each document for him. Ponnapula looked at the documents, but did not read them, and then signed them as "Murali Krishna." In his capacity as president of HRC, Ponnapula signed various papers, including: (1) a loan agreement, stating that the loan proceeds would be used by HRC to operate the parking lot; (2) a promissory note; and (3) a letter directing the proceeds to be disbursed to HRC. In his personal capacity, Ponnapula signed a guaranty for $1.9 million and an affidavit stating that he was familiar with the property and that he was president of HRC.
 
 
 14
 After the closing, the loan proceeds were disbursed to HRC. As planned, the funds were immediately transferred to Zurich and used to pay down the $3 million owed to the Bank. Zurich thereafter received the $4 million loan from the Bank.
 
 
 15
 In September 1990, HRC fell behind on the interest payments to the Bank. At about the same time, Dandapani told Ponnapula to direct any inquiries from the Bank regarding the default to him or Prasad. In early 1991, Prasad told the Bank that he would assume responsibility for the loan, but Prasad subsequently left the United States and has not returned. The Bank contacted Ponnapula directly by letter and phone on several occasions requesting payment and, after months of failing to respond to the Bank's requests, Ponnapula promised to work on a repayment plan. In the spring of 1992, Dandapani and Pasha proposed separate plans for repayment of the loan, both of which were ultimately rejected by the Bank. After supporting Pasha's plan in a letter dated May 4, 1992, Ponnapula never contacted the Bank again.
 
 
 16
 By May 1992, after the loan had gone into litigation, approximately $40,000 was paid on the account. After Ponnapula was convicted, the Bank sold its interest in the parking lot and recovered $1.385 million of the $1.9 million loan.
 
 II. Other Fraudulent Loan Applications
 
 17
 In addition to the evidence directly linking Ponnapula to the $1.9 million loan, the State rebutted Ponnapula's defense of lack of knowledge and intent by presenting evidence at trial that Ponnapula helped Prasad fraudulently obtain three other loans worth millions.
 
 
 18
 For example, in its application for the $4 million loan that was the catalyst for the $1.9 million loan, Zurich listed one of Ponnapula's construction companies, Majestic Construction ("Majestic"), as a major supplier for Zurich. Although Majestic was not a supplier at all, much less a major supplier, Ponnapula was prepared to "respond as a supplier" if the Bank asked him any questions.
 
 
 19
 In another loan application submitted in 1990, Dandapani forged Ponnapula's signature on a personal guaranty for a $1.4 million loan from a different bank, the State Bank of India ("$1.4 million loan"). He instructed Pasha to tell Ponnapula that he was listed as a guarantor. After the $1.4 million loan went into default, the State Bank of India directly contacted Ponnapula. Although his signature on the personal guaranty had been forged, Ponnapula did not deny signing the guaranty and later sent a proposal for the management of the property, which was rejected.
 
 
 20
 Also in 1990, the Prasad Organization applied for a $2.5 million loan from Branch Banking & Trust to be secured by property owned by Cox Trailers, a company in which the Prasad Organization had a majority interest ("$2.5 million loan"). Branch Banking & Trust made approval of the loan conditional on an acceptable environmental report on the property by a professional firm. After an independent firm found unacceptable results, Ponnapula suggested to Prasad and Dandapani that his assistant, Robert Price, could create a fake environmental report that would "pass muster" with the bank. The name of the inspection firm appeared on the report as Edwards Environmental Services, Inc., based on Ponnapula's assurances to Dandapani and Prasad that the firm could be shown to be a valid environmental inspection firm. Price concocted a false report that was accepted by the bank and the loan was approved.
 
 III. State and District Court Proceedings
 
 21
 At the close of trial, the jury returned a guilty verdict, convicting Ponnapula of grand larceny in the first degree and falsifying business records in the first degree for his participation in obtaining the $1.9 million loan. The trial judge set aside the conviction and dismissed the indictment on the basis that the evidence was insufficient to prove Ponnapula knew that the application contained false information. The First Department of the Appellate Division found the evidence sufficient and reversed. People v. Ponnapula, 229 A.D.2d 257, 655 N.Y.S.2d 750, 756-60 (1997). On remand, the trial court sentenced Ponnapula to concurrent terms of imprisonment of one to three years on the larceny count and one year on the falsifying business records count.
 
 
 22
 Petitioner appealed his conviction, arguing, in relevant part, that the evidence regarding the amount of the taking and his intent to commit larceny was insufficient and that the State withheld exculpatory and impeachment evidence from the defense in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The Appellate Division rejected these claims, People v. Ponnapula, 266 A.D.2d 32, 698 N.Y.S.2d 219, 221 (App.Div. 1999), and his application for leave to appeal to the New York Court of Appeals was denied, People v. Ponnapula, 94 N.Y.2d 951, 710 N.Y.S.2d 8, 731 N.E.2d 625 (2000). After the district court denied his petition for a writ of habeas corpus, this appeal followed.
 
 DISCUSSION
 
 23
 We review a district court's denial of a petition for writ of habeas corpus de novo, see Clark v. Stinson, 214 F.3d 315, 319 (2d Cir.2000), cert. denied, 531 U.S. 1116, 121 S.Ct. 865, 148 L.Ed.2d 778 (2001), and its factual findings for clear error, see Amadeo v. Zant, 486 U.S. 214, 223, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). The circumstances under which we may grant the writ are strictly limited to those where an adjudication on the merits in state proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We presume that the state court's factual findings are correct unless they are rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).
 
 I. The Sufficiency of the Evidence
 
 24
 Ponnapula claims that the evidence was insufficient to establish his knowledge or intent to commit larceny because he was never directly told that the loan application contained materially false information. In addition, he contends that, as a matter of New York law, his pledge of the parking lot as collateral offset the amount taken from the Bank and, as a result, the State failed to prove that he stole in excess of $1 million. Thus, he claims that he should have been convicted of a lesser degree of larceny, if at all.
 
 
 25
 In a challenge under 28 U.S.C. § 2254 to the evidentiary sufficiency of a state criminal conviction, we review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Fama, 235 F.3d at 811. Petitioner bears a "very heavy burden" in convincing a federal habeas court to grant a petition on the grounds of insufficient evidence. See Quirama v. Michele, 983 F.2d 12, 14 (2d Cir.1993) (internal quotation marks omitted).
 
 
 26
 When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir.1999). Under New York law, the degrees of larceny are defined by the size of the taking committed by the defendant. Grand larceny in the first degree requires a theft of property that is valued in excess of $1 million. N.Y. Penal Law § 155.42 (McKinney 1999). In addition to the monetary threshold, the government must prove that the defendant specifically intended to deprive the victim of the property and did so by, inter alia, false pretenses or false promise. N.Y. Penal Law § 155.05 (McKinney 1999).
 
 
 27
 Larceny by false pretenses is committed when, with the intent to deprive an owner of his property, a defendant intentionally makes a false representation about a past or presently existing fact upon which the victim relied in parting with his property. See N.Y. Penal Law § 155.05(2)(a); People v. Norman, 85 N.Y.2d 609, 618-19, 627 N.Y.S.2d 302, 650 N.E.2d 1303 (1995). A defendant is guilty of larceny by false promise when, "pursuant to a scheme to defraud, [the defendant] obtains property of another by means of a representation... that he [would] in the future engage in particular conduct, and when he [did] not intend to engage in such conduct." N.Y. Penal Law § 155.05(2)(d).
 
 
 28
 A. Evidence of Larcenous Knowledge and Intent
 
 
 29
 Appellant argues that the evidence did not establish that he knew the documents contained materially false information and therefore he lacked larcenous intent or knowledge. As the district court recognized, the Appellate Division exhaustively analyzed the evidence presented at trial, see Ponnapula, 229 A.D.2d 257, 655 N.Y.S.2d 750, and our independent review of the record reveals sufficient evidence to infer petitioner's knowledge and intent to further Prasad's fraudulent scheme.
 
 
 30
 Ponnapula does not dispute that he signed a personal guaranty, but argues that Dandapani never informed him that his personal worth had been misrepresented. The jury could infer, however, that Ponnapula knew that the Bank would not have accepted his guaranty on such a large loan unless Dandapani had exaggerated Ponnapula's personal worth in the application. Moreover, signing the personal guaranty without the intent to repay the loan, if necessary, constitutes larceny by false promise. Ponnapula's lack of intent to repay was evidenced by his awareness that his personal resources would be inadequate to cover such a sizable loan. Furthermore, he ignored the default notices for months and then relied on Dandapani and Pasha to renegotiate the terms of the loan. Ponnapula ended communication with the Bank after Pasha's repayment plan was rejected and, instead of securing funds to repay the Bank, sought loans with other banks for different projects. As the Appellate Division found, "the jury could reasonably conclude that defendant signed the guaranty merely because it was required, not because he ever truly intended to repay the loan." See Ponnapula, 655 N.Y.S.2d at 758.
 
 
 31
 Further evidence of petitioner's knowledge of the fraud was established by his awareness that the loan was meant for Prasad but that the Bank had been misled to believe that HRC would use the proceeds to purchase the parking lot. Ponnapula furthered these deceptions by dropping his last name when signing the closing documents, a strategic decision that Dandapani and Prasad made to distance Ponnapula from Prasad, and by accepting the position of president and sole stockholder in HRC. Although petitioner contends that the Bank ultimately discovered his relationship to Prasad and that HRC already owned the lot, Ponnapula's intent to deceive the Bank in making the false representations is not negated by the Bank's independent research. Finally, Ponnapula's repeated assistance to Prasad in fraudulently obtaining other loans bolstered the evidence of his knowledge and intent to defraud the Bank.
 
 
 32
 In his petition for habeas relief, Ponnapula merely reasserts that he was not aware of Prasad's scheme and points to ambiguities in the trial testimony. Given the adequate evidence of his knowledge, petitioner has failed to demonstrate that the state court's finding of sufficient evidence of his intent to commit larceny amounted to an unreasonable application of clearly established federal law as required by 28 U.S.C. § 2254(d)(1).
 
 B. The Pledge of Collateral
 
 33
 Ponnapula further contends that the State failed to prove beyond a reasonable doubt that he stole in excess of $1 million, a necessary element of grand larceny, in violation of the Supreme Court's holding in In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In Winship, the Supreme Court held that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Id. at 364, 90 S.Ct. 1068. Ponnapula argues that as a matter of New York law, the amount of the taking should have been reduced by the value of the collateral, from which the Bank ultimately recovered $1.385 million. Thus, according to petitioner, his conviction of grand larceny in the first degree was not proven beyond a reasonable doubt.
 
 
 34
 Although Ponnapula fashions this claim as a challenge under Winship, we conclude that it provides no basis for federal habeas relief because it rests solely on a question of state law. See Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); Lewis v. Jeffers, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).
 
 1. Standard of Deference
 
 35
 Initially, we address Ponnapula's contention that the Appellate Division failed to adjudicate his argument regarding the simultaneously pledged collateral under the New York larceny statute. On that basis, he urges us to review this state law issue de novo. Cf. Sellan v. Kuhlman, 261 F.3d 303, 313-14 (2d Cir.2001); Boyette v. Lefevre, 246 F.3d 76, 89, 91 (2d Cir.2001). We decline the invitation.
 
 
 36
 In Sellan v. Kuhlman, we set forth a three-factor test that federal courts should follow in determining whether a federal claim has been adjudicated "on the merits" by the state court for purposes of § 2254(d)(1). 261 F.3d at 314. The federal courts are directed to consider:
 
 
 37
 (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits.
 
 
 38
 Id. (quoting Mercadel v. Cain, 179 F.3d 271, 274 (5th Cir.1999)). We emphasized that "[n]othing in the phrase `adjudicated on the merits' requires the state court to have explained its reasoning process." Sellan, 261 F.3d at 311. For obvious reasons of comity, we apply the same standard of deference to determine whether a state court has decided an issue of state law on the merits.
 
 
 39
 Applying these factors to the present case, we find that the state court rejected petitioner's "offsetting collateral" theory on the merits. In their briefs filed in the Appellate Division, both parties vigorously argued whether the simultaneous posting of collateral was relevant in satisfying the statutory threshold for grand larceny in the first degree. See Br. for Defendant-Appellant 68-79, Ponnapula, 266 A.D.2d 32, 698 N.Y.S.2d 219; Br. for Respondent 48-50, 53-55, Ponnapula, 266 A.D.2d 32, 698 N.Y.S.2d 219. Although the First Department did not address petitioner's theory by name, it rejected his evidentiary claims on the ground that "the element of first-degree grand larceny requiring a taking of over one million dollars was satisfied by a temporary taking in excess of the threshold amount, notwithstanding that the victimized bank's ultimate loss was less than that sum." Ponnapula, 698 N.Y.S.2d at 220. Nothing in the record suggests that the Appellate Division ignored the extensive briefing by the parties or decided the issue on procedural, rather than substantive, grounds.
 
 
 40
 Consequently, we find that the state court adjudicated, and rejected, Ponnapula's claim that the pledged collateral should be taken into account when determining the degree of larceny applicable to him under New York law.
 
 2. Winship Claim
 
 41
 Petitioner argues that, even if the Appellate Division decided the issue, its decision was incorrect as a matter of state law and thus his due process rights under Winship have been violated. The district court rejected this argument as a ground for habeas relief, stating that "[i]t's a nice question of state law.... [But][i]t doesn't rise to a federal issue." We agree with the district court that Ponnapula may not invoke Winship to transform this state law issue into a federal question cognizable in a federal habeas proceeding.
 
 
 42
 It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the United States. See 28 U.S.C. § 2254; Estelle, 502 U.S. at 67-68, 112 S.Ct. 475 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). In order to avoid this hurdle, Ponnapula characterizes his claim as one under Winship. Specifically, he argues that before deciding whether the State proved beyond a reasonable doubt the statutory requirement of a taking in excess of $1 million, thereby satisfying Winship, we must engage in an analysis of state law to determine whether the simultaneously pledged collateral offset the amount of the larcenous taking.
 
 
 43
 While petitioner's Winship argument is innovative, not "every error of state law can be transmogrified by artful argumentation into a constitutional violation." Sanna v. Dipaolo, 265 F.3d 1, 12 (1st Cir.2001). Which acts constitute the elements of a state crime is a question generally answerable only by the state legislature and state courts, see Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) ("This Court ... repeatedly has held that state courts are the ultimate expositors of state law...."), and is antecedent to the constitutional requirement that the government prove those elements beyond a reasonable doubt. See McMillan v. Pennsylvania, 477 U.S. 79, 85, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986); Patterson v. New York, 432 U.S. 197, 211 n. 12, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) ("The applicability of the reasonable-doubt standard ... has always been dependent on how a State defines the offense that is charged in any given case...."); McKee v. Nix, 995 F.2d 833, 836 (8th Cir.1993). Winship does not invite federal habeas courts to engage in a substantive analysis of state statutory terms. Our federal constitution does not dictate to the state courts precisely how to interpret their own criminal statutes.[2]
 
 
 44
 Therefore, we hold that a writ of habeas corpus based on Winship may be issued only where the government's burden of proof has been impermissibly reallocated or reduced. See, e.g., Mullaney, 421 U.S. at 701, 95 S.Ct. 1881. If this were not the rule, almost every nuance of state law could be fashioned into a Winship problem, thereby transforming federal habeas courts into super-appellate state courts. Both Congress and the Supreme Court prohibit such a role for federal habeas courts.
 
 
 45
 We find no support for Ponnapula's assertion that a federal court reviewing a Winship challenge is somehow relieved of the bar against reviewing state law issues simply because the claim is a matter of first impression and was decided by the state intermediate court instead of the state's highest court. Both parties agree that the New York Court of Appeals has yet to address the question of the effect of simultaneously pledged collateral on a larceny conviction. Where, as here, the highest court of the state has declined to hear a defendant's appeal involving a matter of first impression, we are left only with the state intermediate court's interpretation of the terms in the state statute and we are bound by that interpretation in our review of a defendant's Winship claim. See, e.g., Estelle, 502 U.S. at 66, 67-68, 112 S.Ct. 475 (rejecting state law error as basis for federal habeas relief in case reviewing decision by state intermediate court). Our review under Winship is limited to whether the elements so defined have been proven beyond a reasonable doubt.
 
 
 46
 In this case, the parties do not dispute that the Bank of India extended a $1.9 million loan. The only question remaining is whether, as a matter of state law, the amount of the larcenous taking should be reduced by the amount of the simultaneously pledged collateral. The Appellate Division answered this question in the negative, thus ending our inquiry.
 
 C. Fair Notice
 
 47
 Although the previous claim fails because it rests solely on state law grounds, Ponnapula also contends that the state court's interpretation of the larceny statute was so unexpected under previous New York precedent as to violate the "fair notice" aspect of the Due Process Clause. He argues that under New York law, a defendant is guilty of larceny only if he intends to permanently deprive the victim of property and that the simultaneous pledge of collateral negates such an inference of intent. "Fair notice, of course, is a right of federal constitutional dimension," Lurie v. Wittner, 228 F.3d 113, 126 (2d Cir.2000), cert. denied, 532 U.S. 943, 121 S.Ct. 1404, 149 L.Ed.2d 347 (2001), and thus his claim is appropriate for habeas review by this court.
 
 
 48
 Prior to this case, the New York courts had not addressed the specific question of whether simultaneously pledged collateral negates a defendant's intent to permanently deprive the owner of his property. Due process is not, however, violated simply because the issue is a matter of first impression. See United States v. Kinzler, 55 F.3d 70, 74 (2d Cir.1995); see also Moskal v. United States, 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (stating that criminal statute is not automatically deemed ambiguous for purposes of the rule of lenity because conflicting judicial authority exists or narrower constructions are possible). Rather, the Supreme Court has stated that the "touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." United States v. Lanier, 520 U.S. 259, 267, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). While the Due Process Clause prohibits novel judicial constructions that are "indefensible by reference to the law which had been expressed prior to the conduct in issue," Bouie v. City of Columbia, 378 U.S. 347, 354, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964) (internal quotation marks omitted), courts are free to provide "clarity ... by judicial gloss on an otherwise uncertain statute," Lanier, 520 U.S. at 266, 117 S.Ct. 1219.
 
 
 49
 The holding of the First Department can be viewed as a natural step in refining a principle long-enunciated by New York courts, namely that larcenous intent is shown where the defendant intends to exercise control over another's property "for so extended a period or under such circumstances as to acquire the major portion of its economic value or benefit." People v. Jennings, 69 N.Y.2d 103, 118, 512 N.Y.S.2d 652, 504 N.E.2d 1079 (1986) (quoting N.Y. Penal Law § 155.00[4] (McKinney 1999)). As the First Department noted, Ponnapula's actions exhibited the intent to deprive the Bank permanently of the entirety of the loan proceeds. Petitioner induced the Bank to part with the $1.9 million by signing a personal guaranty with the knowledge that his assets were insufficient to cover such a sizable loan. The money was immediately diverted to Prasad's other schemes and no effort was made to repay the defaulted loan until after litigation had begun. Ponnapula then ended all communication with the Bank after a mere $40,000 had been paid into the account. That the Bank later resorted to proceedings against the collateral to recover part of its loss does not negate Ponnapula's intent to appropriate the $1.9 million.
 
 
 50
 The state court's interpretation is not, as Ponnapula suggests, contrary to the "joyriding" line of New York cases establishing that evidence of mere borrowing without permission, if coupled with the intent to return the property, is insufficient to support a conviction for larceny. See, e.g., Jennings, 69 N.Y.2d at 118-19, 512 N.Y.S.2d 652, 504 N.E.2d 1079; People v. Matthews, 61 A.D.2d 1017, 402 N.Y.S.2d 617, 618 (App.Div.1978). These cases are limited to the narrow set of circumstances where the defendant intends to return the owner's property in full after a short and discrete period of time. See, e.g., Jennings, 69 N.Y.2d at 117, 119, 512 N.Y.S.2d 652, 504 N.E.2d 1079 (emphasizing, in decision to dismiss larceny indictments, that all of the allegedly stolen funds were returned within 48-hour periods); see generally People v. Olivo, 52 N.Y.2d 309, 320 n. 8, 438 N.Y.S.2d 242, 420 N.E.2d 40 (1981) (cautioning that "[i]t would be the rare case indeed in which the evidence establishes all the other elements of the crime but would be insufficient to give rise to an inference of intent"). Posting collateral with a fraudulent loan application is qualitatively different from a situation where the stolen property itself is returned to the victim. In the former case, the victim assumes the risk that the value of the collateral might diminish over the course of the loan and must resort to legal proceedings to claim title and liquidate the collateral. The Appellate Division's decision to exclude larceny by fraudulent loan applications supported by collateral from the "joyriding" line of cases was both reasonable and foreseeable, and thus does not run afoul of the Due Process Clause.
 
 II. Brady/Giglio Claim
 
 51
 Finally, petitioner argues that, in violation of his due process rights established by Brady and Giglio, the State withheld an affidavit by David Moore, who served as Ponnapula's bank reference, that could have been used for exculpatory or impeachment purposes.
 
 
 52
 Moore told the prosecution that he had authored Ponnapula's bank reference for the $1.9 million loan. In an affidavit, however, he stated that a letter ostensibly written by him as a bank reference for Pasha had been forged. The parties presented conflicting stories in the state courts as to whether the defense was allowed to view the Moore affidavit. Ponnapula argued that while the defense `tagged' the folder containing the document, permission to view it was refused. The State contended that the defense reviewed and tagged the document during open file discovery.
 
 
 53
 Both the trial court and the Appellate Division found that the defense was afforded the opportunity to view the document. See Ponnapula, 698 N.Y.S.2d at 221. Petitioner presents no evidence, and certainly no "clear and convincing evidence," to overcome the presumption of correctness attached to the state courts' findings. 28 U.S.C. § 2254(e)(1).
 
 CONCLUSION
 
 54
 For the foregoing reasons, we hereby affirm the judgment of the district court denying the petitioner's application for a writ of habeas corpus.
 
 
 
 Notes:
 
 
 [1]
 The Honorable John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [2]
 It is possible, of course, that a state court's interpretation of a criminal statute may be so egregious as to be fundamentally unfair and thus violate due process. Under these rare circumstances, habeas relief may be warranted under different federal rights, such as the fair notice aspect of the Due Process Clause, but not underWinship. See infra Part I.C.