**UNITED STATES of America, Appellee,**

v.

**James Leonard BROWN, Defendant-Appellant.**

**No. 1034, Docket 77–1033.**

United States Court of Appeals, Second Circuit.

Argued April 15, 1977.

Decided May 16, 1977.

Jacob Laufer, Asst. U. S. Atty., New York City (Robert B. Fiske, U. S. Atty., S. D. N. Y., Frederick T. Davis, Asst. U. S. Atty., New York City, of counsel), for appellee.

Michael B. Pollack, New York City (Charles L. Weintraub, New York City, of counsel), for defendant-appellant.

Before CLARK, Associate Justice,* MOORE and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

The only issue of any substance raised on this appeal is whether the elaborate fraudulent scheme admittedly perpetrated by the appellant James L. Brown constitutes a violation of the antifraud provisions of the federal securities laws. We hold that it does and therefore affirm the conviction. Other claims of error by the trial judge are clearly frivolous and not worthy of comment here.

After an eight-day trial before District Judge Charles S. Haight, Jr. and a jury, a judgment of conviction was entered against Brown on December 23, 1976 in the United States District Court for the Southern District of New York. Brown was convicted

---

* Tom C. Clark, Associate Justice, United States Supreme Court, Retired, sitting by designation.

on one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and on eight counts of substantive violations of the federal securities laws, 15 U.S.C. §§ 77q(a) and 77x; 18 U.S.C. § 2. Following Brown's conviction, Judge Haight sentenced him on the conspiracy count to five years imprisonment, with execution of all but six months suspended, and four and one half years probation commencing upon the termination of incarceration. On the remaining counts sentence was suspended and Brown was placed on periods of four and one half years probation, each to be served concurrently with the period imposed on the conspiracy count. At the time of this appeal, Brown was incarcerated under a sentence imposed for a prior unrelated conviction.

### I

The government established by abundant proof at trial principally through the testimony of other conspirators the following facts which are not denied on this appeal. Sometime in March 1972 Brown met with Chester Gray, John Krappman and Harvey Axelrod, all of whom testified for the government, for the purpose of concocting and executing a scheme whereby American Home Products Corporation (AHPC) common stock certificates would be counterfeited. After considerable difficulty, phony stock certificates were finally produced bearing the forged signature of one Gerald L. Smith, an AHPC stockholder. The next step was to exchange the counterfeit AHPC certificates through the transfer agent of AHPC, Manufacturers Hanover Trust Company (MHTC), where Krappman was employed, for genuine certificates in smaller denominations. Axelrod had opened a trading account at Seed Capital Corporation (Seed), a brokerage firm where his relative, Benigno, was employed. The account was in the name of Gerald L. Smith. During October 1972, Seed accepted into the unauthorized Gerald L. Smith trading account 13,000 shares of the newly issued AHPC certificates which while genuine were derived from those which had been counter-

feited and forged. Seed then sold the certificates to and through New York brokerage houses. It sold 6,000 shares directly to Weeden & Co. which mailed to Seed written confirmation of the purchase. Seed then sold 6,500 shares through Schweickart & Co. which also mailed confirmations to Seed. The final 500 shares were sold through Ferkauf & Co. which had its clearing operations handled by Loeb Rhoades & Co.

Seed ultimately delivered the certificates thus spawned through the counterfeit shares bearing the forged name of Gerald L. Smith against payment by the brokerage houses in the total amount of $1.4 million. The money was deposited to Seed's account and its checks totalling close to that amount were delivered to Axelrod by his relative, Benigno. Axelrod then forged Gerald L. Smith's endorsement signature on the back of the checks. Benigno subsequently cashed checks at the Irving Trust Co. receiving payment in cash. The money was split up into shares among the swindlers, Brown receiving 50% of about $1.4 million.

### II

On this appeal, Brown argues that since the scheme set forth was designed to defraud the transfer agent MHTC and not the investors who purchased genuine stock certificates, for whose protection the Securities Act was intended, it is not within § 77q(a). While this court has noted that the primary purpose of the 1933 Act was to protect investors, *SEC v. Guild Films Co.*, 279 F.2d 485, 489 (2d Cir.), cert. denied, 364 U.S. 819, 81 S.Ct. 52, 5 L.Ed.2d 49 (1960); *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 463 (2d Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959), appellant has not cited and we have not found any case holding that this was its sole purpose and that unless the ultimate purchaser of securities is injured or defrauded the criminal provisions of § 77q(a) are not violated. The language of that section set forth in the

margin [1] broadly condemns the employment of "any device, scheme, or artifice to defraud" or the engagement "in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." There can be no doubt that there was established on trial a device, scheme or artifice to defraud. Stock certificates were counterfeited, the name of an innocent investor, Gerald L. Smith, was forged and the transfer agent was duped into issuing replacement certificates which while facially legitimate were produced as the result of the fraudulent scheme.

■ The argument that neither the ultimate investors nor Smith were in fact defrauded is based on the proposition that under § 8–311 of the Uniform Commercial Code the investors owned the securities free of any adverse claims of the original owner Gerald L. Smith. Moreover, it is argued that Smith was not injured because under § 8–104 MHTC had the fiduciary obligation of restoring him to his original position by buying identical securities reasonably available on the market as a replacement. The argument is unpersuasive. The fact that Smith might have a civil remedy to replace the stock which defendant Brown and his colleagues converted by counterfeit and forgery hardly prevents him from having been defrauded. One might as well argue that if Brown stole Smith's fully insured automobile, he was never the victim of a larceny.

We see no purpose in construing the statute so narrowly and we have not in the past. Thus in *United States v. Gentile*, 530 F.2d 461, 467 (2d Cir.), cert. denied, 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976) we stated:

> While it was noted in the *Guild Films* case that the Securities Act of 1933 was primarily intended to protect investors, 279 F.2d at 489, there is no reason to doubt that Congress intended that Act to protect defrauded lenders just as much as defrauded buyers.

■ Similarly here there is no doubt that Congress in the broad language employed in § 77q(a) was intent upon protecting the integrity of the marketplace in which securities are traded. Here MHTC, as the transfer agent for AHPC, plays an integral role in the marketing of securities.[2] MHTC was clearly defrauded as was the innocent investor Smith. The fact that the Uniform Commercial Code might ultimately shift the monetary loss from Smith and the ultimate investors hardly serves to exculpate Brown and his group of fellow thieves, counterfeiters and forgers from criminal responsibility. This was not of course the garden variety of security fraud—its long planned execution, assisted by faithless employees of MHTC and Seed, constituted a massive assault upon innocent investors and brokerage houses and their normal business procedures which we cannot construe the statute to countenance. The fact that there is no

---

1. § 77q. Fraudulent interstate transactions

   (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

   (1) to employ any device, scheme, or artifice to defraud, or

   (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

   (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

2. In its efforts to facilitate the establishment of a national system for the clearance and settlement of securities transactions, Congress recognized the importance of the transfer agent's function in the Securities Acts Amendments of 1975, Pub.L.No.94–29, § 15, 89 Stat. 141 (June 4, 1975), codified at 15 U.S.C. § 78q–1. This legislation had its genesis in the "paperwork crisis" of 1968–70, when the failure of the securities and banking industries to process the volume of trading forced more than 100 brokerage firms into liquidation, largely because of record keeping problems. Note, Legislation: Securities Acts Amendments of 1975, 29 Okla. L.Rev. 462, 474 (1976). Clearing agencies and transfer agents are now required to register and to keep records and file reports. Castruccio & Tischler, Developments in Federal Securities Regulation—1975, 31 Bus.Law. 1855, 1886 (1976).

litigated fact pattern precisely in point may constitute a tribute to the cupidity and ingenuity of the malefactors involved but hardly provides an escape from the penal sanctions of the securities fraud provisions here involved.

■ The same may be said for the argument that the use of the mails to send confirmation slips to Seed by the brokerage firms who had purchased the fraudulently derived securities was insufficient to support federal jurisdiction. While it is true that the mails were not utilized to effect the initially fraudulent switch perpetrated at MHTC, nonetheless a necessary part of the scheme was the distribution of the securities so obtained. In *Franklin Savings Bank v. Levy*, 551 F.2d 521, 524 (2d Cir. 1977), we recently reemphasized our holding in *United States v. Cashin*, 281 F.2d 669, 673–74 (2d Cir. 1960) (citation omitted) on the issue of the use of the mails as a basis for jurisdiction under the 1933 Act:

> The use of the mails need not be central to the fraudulent scheme and may be entirely incidental to it. Indeed, in the very case before us the only alleged use of the mails was to confirm purchases already induced by the defendants' deceit. No claim is made that fraudulent matter was mailed or even that the mailings alleged were necessary to the execution of the unlawful scheme.

As we have indicated, the other claims made on this appeal have been considered and deemed frivolous.

Judgment affirmed.