UNITED STATES of America, Appellee,

v.

**Norman J. TANNENBAUM,**
**Defendant–Appellant.**

**No. 1285, Docket 90–1732.**

United States Court of Appeals,
Second Circuit.

Argued April 15, 1991.

Decided May 13, 1991.

Jacob Laufer, New York City (Laufer & Farkash, Patricia M. Karish, of counsel), for defendant-appellant.

Stanley J. Okula, Jr., Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty., Eastern District of New York, David C. James, Matthew E. Fishbein, Sean F. O'Shea, of counsel), for appellee.

Before FEINBERG, VAN GRAAFEILAND and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Defendant-appellant Norman Tannenbaum appeals from a judgment entered in the United States District Court for the Eastern District of New York (Jacob Mishler, *District Judge*) convicting him, following a jury trial, of (1) conspiracy to (a) avoid the filing of currency transaction reports ("CTRs") and (b) engage in a trick or scheme to conceal transfers of currency exceeding $10,000, in violation of 18 U.S.C. § 371 (Count One); (2) aiding and abetting the causing of a financial institution to fail to file CTRs in violation of 31 U.S.C. §§ 5313(a), 5322 and 18 U.S.C. § 2 (Counts Two through Seven); and (3) engaging in a trick or scheme to (a) conceal the transfers of currency exceeding $10,000 and (b) cause a financial institution to fail to file CTRs, in violation of 18 U.S.C. §§ 1001, 2 (Counts Eight through Thirteen).

Tannenbaum's appeal raises numerous issues, only three of which merit discussion. First, Tannenbaum claims that his conviction is void because he did not have constitutionally mandated notice that cash transfers between private individuals could trigger the CTR filing requirement of the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.* (the "Act"). Second, Tannenbaum challenges his conviction on Count One, the conspiracy charge, on the ground that two of the overt acts charged occurred outside the statute of limitations and thus venue was lacking in the Eastern District of New York. Finally, Tannenbaum complains of errors in the jury charge concerning aiding and abetting liability. We reject each of

these arguments and affirm the convictions.

## BACKGROUND

Tannenbaum's convictions grew out of his relationship with David and Fibi Vanounou, who were separately convicted of, and then testified at Tannenbaum's trial about, their involvement in the scheme described below.

David Vanounou owned a business that exported electronics and related goods to Israel. At some point in 1982, David needed additional financing for his business and obtained a loan from Jose Stroh, who owned a currency exchange in Cali, Colombia. In 1983, David tried to repay this loan by depositing approximately $50,000 in cash in the New York branch of the bank where Stroh maintained an account. When the bank teller told David that David would have to fill out a report to the Internal Revenue Service, David aborted his attempt to deposit the cash and called Stroh for instructions.

Stroh advised David either to purchase money orders in amounts less than $10,000 each, or to buy private individual's checks and then deposit the money orders or checks into Stroh's account. David also sought the counsel of one Ben Bell (also known as Ben Bellarno) who was David's supplier of goods for his exporting business. Bell advised David that the better course was to purchase checks from individuals because, according to Bell, buying money orders could result in David's arrest. Bell agreed to direct to David individuals who would exchange their personal checks, with the payee's name left blank, for David's cash. Toward the end of 1983, David had managed to repay his debt to Stroh by depositing into Stroh's account checks written by persons who were supplied by Bell.

Pleased with their success, Stroh and David Vanounou agreed to continue the scheme. Stroh would send messengers with cash to David; David would trade the cash for checks from various cooperative individuals; and then David would deposit the checks into Stroh's account. For these services, David received a commission and he paid Bell a share of it for the continued supply of willing individuals with open check books. Everyone was happy until checks started to bounce in Stroh's account. Stroh requested that henceforth David obtain certified checks. Bell, concerned that he could not find people willing to certify their checks, came up with a better idea: he would introduce David to an accountant—the defendant Tannenbaum.

Tannenbaum and David met in late 1983. David told Tannenbaum that he needed Tannenbaum to write checks in exchange for David's cash. Tannenbaum inquired about David's need for the checks and whether the cash Tannenbaum would receive was drug money. David explained that he wanted to avoid filing a report with the income tax authorities and that "the worst thing that might be involved here is money smuggling ... [and that] maybe [Stroh] wanted to avoid paying taxes on these money transfers." Tannenbaum agreed to open a special account and supply checks therefrom on the condition that no more than $50,000 be debited in his account in a single day. Later that day, David told Tannenbaum that he had $100,000 cash ready to be exchanged for checks. Tannenbaum explained that he did not want to do the exchange in his own office for fear that others might learn about the scheme. The two agreed to meet at David's Manhattan apartment that night.

When Tannenbaum arrived at David's home, he looked "disturbed and nervous" and expressed concern that David lived uncomfortably close to federal government offices, including an office of the F.B.I. Tannenbaum exchanged a check for $100,000 cash, but told David that further transactions would have to be executed somewhere else.

During the following six to eight months, Tannenbaum wrote checks in exchange for over $1 million in cash. Some of the checks were written for amounts different than the amount of cash received. When David inquired of Tannenbaum why he did not write checks "in round numbers," Tannenbaum replied that "it looks more

businesslike, as if we were conducting a business." These transactions took place in Manhattan at either Bell's or Tannenbaum's office, during which Tannenbaum voiced his concern that others, including Tannenbaum's secretary, would learn of their scheme. When the exchanges were made in Tannenbaum's office, Tannenbaum cautioned David to take precautions to ensure that (1) Tannenbaum's secretary would not know that David was bringing cash; and (2) David was not followed. Although he knew he was supposed to, David Vanounou failed to file CTRs in connection with these currency exchanges.

Tannenbaum stipulated at trial that he opened two checking accounts in a Brooklyn branch of Manufacturer's Hanover Trust ("MHT") using phony names, addresses and social security numbers. The accounts were opened in the name of Bell Construction Company and L & R Building Company. David's testimony was substantially corroborated by several witnesses, including his wife, Fibi, who was present at the initial $100,000 transaction and who also participated in later transactions, Bell, Bell's secretary, a secretary in Tannenbaum's office who, at his direction, wrote some of the checks (with the payee's name left blank), and the district manager of the MHT Brooklyn branch who closed the accounts when he thought this was all part of a check kiting scheme.

Tannenbaum was convicted on all thirteen counts and was sentenced to concurrent one-year and one-day terms of imprisonment on Counts One, Seven and Thirteen and concurrent three-month terms of probation on the remaining counts.

## DISCUSSION

### I. NOTICE OF CRIMINALITY

"When a person of ordinary intelligence has not received fair notice that his contemplated conduct is forbidden, prosecution for such conduct deprives him of due process." *United States v. Matthews*, 787 F.2d 38, 49 (2d Cir.1986) (citing *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939)).

To survive scrutiny under the due process clause, the law must "give sufficient warning that men may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within the scope." *United States v. Herrera*, 584 F.2d 1137, 1149 (2d Cir.1978). Tannenbaum complains that § 5313 of the Bank Secrecy Act violates this "fair warning" requirement, and thus, the indictment must be dismissed. Specifically, Tannenbaum claims that the Act does not provide adequate notice that the CTR filing requirement applies to cash transactions in excess of $10,000 between private individuals, as opposed to banks or institutions. We disagree.

Section 5313(a) of the Bank Secrecy Act requires all "financial institutions" to report currency transactions in excess of $10,000. *See* 31 U.S.C. § 5313(a); 31 C.F.R. § 103.22(a) (1984). The term "financial institution" is defined in § 5312(a) of the Act and in regulations promulgated pursuant thereto by the Secretary of the Treasury. Section 5312(a)(2) contains many definitions of "financial institution," including "a private banker," 31 U.S.C. § 5312(a)(2)(C), and "an issuer, redeemer, or cashier of travelers' checks, checks, money orders, or similar instruments." *Id.* at § 5312(a)(2)(K). The regulations further define the term "financial institution":

> *Financial institution.* Each agency, branch or office within the United States of any person doing business in one or more of the following capacities listed below:
>
> * * * * * *
>
> (3) A person who engages as a business in dealing in or exchanging currency as, for example, a dealer in foreign exchange or a person engaged primarily in the cashing of checks....

31 C.F.R. § 103.11(3) (1984).

The government's theory at trial is that David and Fibi Vanounou were a financial institution as defined in subdivision (3) of the regulation. Relying solely on the

first sentence of the regulation, Tannenbaum argues that only those persons who are an "agency, branch or office" of the persons listed in the regulation can be deemed a financial institution. Indeed, the Seventh Circuit has adopted this interpretation. *See United States v. Bucey,* 876 F.2d 1297, 1306–07 (7th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989); *United States v. Riky,* 669 F.Supp. 196 (N.D.Ill.1987). As the *Bucey* court itself noted, the Seventh Circuit decisions are at odds with the law in this Circuit. *See Bucey,* 876 F.2d at 1305.

In *United States v. Goldberg,* 756 F.2d 949 (2d Cir.), *cert. denied,* 472 U.S. 1009, 105 S.Ct. 2706, 86 L.Ed.2d 721 (1985), we undertook a lengthy analysis of the legislative history of the Act. In concluding that a *de facto* partnership or joint venture was among the entities upon which Congress intended to impose the CTR filing requirement, we observed that "[t]he regulations define a financial institution in part as a 'person.' There is no indication in the statute or the regulations that a natural person cannot be considered a financial institution, and it seems strained to assume that the term 'person' was intended to exclude natural persons." *Id.* at 955. Other circuits have adopted this reasoning, holding that an individual can be a financial institution. *See, e.g., United States v. Cure,* 804 F.2d 625, 628 (11th Cir.1986); *United States v. Dela Espriella,* 781 F.2d 1432, 1436–37 (9th Cir.1986). It was entirely proper, therefore, for the jury to determine, as it did, that the Vanounous (or even David Vanounou individually) were a financial institution.

We reject Tannenbaum's attempt to elevate what has become a "split in the circuits", a not uncommon occurrence, into an argument that § 5313 must therefore violate the fair warning requirement of due process. "[I]t is immaterial that [at the time Tannenbaum committed the acts] 'there [was] no litigated fact pattern precisely in point,'" *United States v. Ingredient Technology Corp.,* 698 F.2d 88, 96 (2d Cir.), *cert. denied,* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983) (quoting *United States v. Brown,* 555 F.2d 336, 339–40

(2d Cir.1977)), and there was ample evidence at trial that Tannenbaum "knew [he was] committing a wrongful act." *Id.* Indeed, since "the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." *Screws v. United States,* 325 U.S. 91, 102, 65 S.Ct. 1031, 1036, 89 L.Ed. 1495 (1945) (plurality opinion).

## II. VENUE

Tannenbaum argues that the indictment is defective because the overt acts in the conspiracy charge do not support venue in the Eastern District of New York. There is no dispute that all of the checks-for-cash transfers occurred in Manhattan.

The indictment, which was handed-up on July 31, 1989, charges four overt acts: (1) the opening of a bank account in the name of Bell Construction Company at MHT in Brooklyn on or about January 23, 1984; (2) the opening of a bank account in the name of L & R Building Company at MHT in Brooklyn on or about January 23, 1984; (3) causing a check for $25,000 to be issued on the Bell Construction Company account on or about August 3, 1984; and (4) causing a check for an undescribed amount to be issued on the L & R Building Company account on or about August 3, 1984.

The crime of conspiracy, 18 U.S.C. § 371, is a continuing offense, the prosecution of which is proper "in any district in which such offense was begun, continued or completed." 18 U.S.C. § 3237(a); *see United States v. Cordero,* 668 F.2d 32, 43 n. 17 (1st Cir.1981). Thus, venue is appropriate in a district where any act in furtherance of the conspiracy was committed. *See United States v. Ramirez–Amaya,* 812 F.2d 813, 816 (2d Cir.1987).

Whether overt acts (3) and (4) are sufficient to confer venue need not detain us. Although the checks were written in Manhattan, the actual debiting of the accounts—which was not only foreseeable but, indeed, necessary to the success of the

scheme—occurred at Tannenbaum's bank in Brooklyn. Since "venue is properly laid in 'the whole area through which force propelled by an offender operates'," *United States v. Candella*, 487 F.2d 1223, 1228 (2d Cir.1973) (quoting *United States v. Johnson*, 323 U.S. 273, 275, 65 S.Ct. 249, 250, 89 L.Ed. 236 (1944)), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1563, 39 L.Ed.2d 872 (1974), these acts rendered venue appropriate in Brooklyn.

■ Tannenbaum presents a novel argument in connection with overt acts (1) and (2). The argument here is not *where* the bogus accounts were opened (clearly the opening of a bank account in Brooklyn is sufficient to lay venue there), but *when* the accounts were opened. Tannenbaum opened the accounts in January 1984, more than five years before the July 31, 1989 indictment, and because the acts occurred outside the statute of limitations, they may not be considered for substantive purposes, i.e. as overt acts to complete the crime of conspiracy. *See* 18 U.S.C. § 3282 (establishing a five-year statute of limitations for non-capital crimes). By analogy, the argument goes, overt acts occurring outside the statute of limitations may not be considered to lay the basis of venue, even though they took place within the district. This theory does not withstand scrutiny.

As Tannenbaum concedes, to sustain a conviction under § 371, the government need not prove that all of the overt acts charged were committed within the five-year limitations period. *See United States v. Scop*, 846 F.2d 135, 138–39 (2d Cir.), *overruled in part on other grounds*, 856 F.2d 5 (2d Cir.1988). Nor is the government burdened with proving that all of the overt acts occurred within the district. *See* 18 U.S.C. § 3237(a); *Ramirez–Amaya*, 812 F.2d at 816. We are unaware of any law, however, that requires overt acts serving as a basis for venue to be committed within the statute of limitations.

Rules governing venue and limitations serve distinct purposes. Statutes of limitations serve "to *limit exposure* to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past." *Toussie v. United States*, 397 U.S. 112, 114, 90 S.Ct. 858, 860, 25 L.Ed.2d 156 (1970) (emphasis added).

Rules of venue, which are no less important, serve as a "safeguard against the injustice and hardship involved when the accused [is] prosecuted in a place remote from his home and acquaintances." *United States v. Busic*, 549 F.2d 252, 258 (2d Cir.1977). Although the government must prove that each *crime* has been timely prosecuted in the proper district, we discern no valid reason to burden the government with proving that the *overt act* establishing proper venue also must have been committed within the statute of limitations. Indeed, "[i]mposition of a limitations requirement [for the overt acts establishing just venue] would bifurcate a conspiracy into two sets of events—those within the limitations period and those without—and thereby conflict with the fundamental nature of a 'continuing crime'. Absent an explicit congressional mandate, such an additional hurdle for establishing venue in a conspiracy case should not be imposed." *United States v. Baltimore & O.R.*, 538 F.Supp. 200, 204 (D.D.C.1982), *aff'd on other grounds*, 717 F.2d 593 (D.C.Cir.1983). We hold, therefore, that overt acts (1) and (2), although committed outside the statute of limitations, were sufficient to confer venue in the Eastern District of New York.

## III. THE AIDING AND ABETTING CHARGE

Tannenbaum claims that he is entitled to a new trial on Counts Eight through Thirteen because the district court instructed the jury that he could be convicted under § 1001 by virtue of aiding and abetting liability under 18 U.S.C. § 2(a). He now argues that the district court should have instructed the jury that his liability under

The

§ 1001 is governed solely by 18 U.S.C. § 2(b), and not § 2(a).

Tannenbaum submitted a request to charge on Counts Eight through Thirteen quoting the language of § 2(b). After the district court instructed the jury on Counts Eight through Thirteen, Tannenbaum's only objection to the § 2(a) aiding and abetting language was a request "to convey to the jury those concepts stated in our request to charge that has reference to the Labat, L A B A T case." We assume counsel was referring to *United States v. Labat*, 905 F.2d 18 (2d Cir.1990), a case that makes no distinction between § 2(a) and § 2(b).

 Tannenbaum was obligated to state "distinctly the matter to which [he] objects and the grounds of the objection," Fed.R.Crim.P. 30; *see United States v. Scarpa*, 913 F.2d 993, 1020–21 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990); *United States v. Civelli*, 883 F.2d 191, 194 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989), and his "requested instructions do not substitute for specific objections to the court's instructions." *United States v. Graziano*, 710 F.2d 691, 696 n. 8 (11th Cir.1983) (citing *United States v. Byrd*, 542 F.2d 1026, 1028 (8th Cir.1976)), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1910, 80 L.Ed.2d 459 (1984). Since Tannenbaum failed to specifically protest that the district court charged § 2(a) rather than § 2(b), our review is limited to a determination of whether the district court committed plain error. *See Scarpa*, 913 F.2d at 1021. We conclude that it did not.

"One purpose of 18 U.S.C. § 2 is to enlarge the scope of criminal liability under existing substantive criminal laws so that a person who operates from behind the scenes may be convicted even though he is not expressly prohibited by the substantive statute from engaging in the acts made criminal by Congress." *United States v. Ruffin*, 613 F.2d 408, 413 (2d Cir.1979).

We have previously explained that a person in Tannenbaum's position—someone under no duty to file a CTR under § 5313 or to disclose a material fact under § 1001 and thus lacking the legal capacity to commit the substantive offense—could, nonetheless, be liable as a principal under § 2(b) if he "willfully caused" another person, who was burdened with such a duty, to fail to discharge that duty. *See United States v. Nersesian*, 824 F.2d 1294, 1312 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987) (liability under § 2(b) for willfully causing another to fail to disclose a material fact as obligated by § 1001); *United States v. Heyman*, 794 F.2d 788, 791 (2d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986) (liability under § 2(b) for willfully causing another to fail to file a CTR as obligated by § 5313).

That the conviction could be based upon § 2(b) does not imply that a conviction under § 1001 could not alternatively be predicated on aiding and abetting liability under § 2(a). The fact that the accused does not possess the legal capacity to commit the substantive offense does not mean that he cannot be convicted pursuant to § 2(a) of aiding and abetting the commission of the substantive offense by another. *See United States v. Ruffin*, 613 F.2d at 413 (citing *United States v. Giordano*, 489 F.2d 327 (2d Cir.1973) and *Giragosian v. United States*, 349 F.2d 166 (1st Cir.1965)). Thus, the inability to commit the substantive offense is immaterial. If the defendant "willfully causes" someone who has the legal capacity to commit the substantive offense, the defendant may be convicted under § 2(b); if the defendant "aids and abets" the commission of the substantive offense by another who possesses the legal capacity to commit the substantive crime, the defendant may be convicted under § 2(a). There is, therefore, no reason to conclude that Tannenbaum could not be convicted as an aider and abetter under § 2(a) for his participation in a trick or scheme to conceal material facts in violation of § 1001.

Tannenbaum complains, however, that he did not learn that the jury would be instructed under § 2(a) until the charge itself was read. Citing *United States v. Hernandez*, 730 F.2d 895 (2d Cir.1984), Tannenbaum baldly argues that he was prejudiced by the unexpected change in theory. *Hernandez* only holds, however, that it is not

error for a court to refuse a belated request for a § 2(b) charge after the jury has already been instructed under § 2(a) when to do so might prejudice a co-defendant. *Id.* at 900. Absent any suggestion by Tannenbaum—and there is none—as to *how* the charge affected his defense, we cannot assume unfair prejudice. The district court did instruct the jury that Tannenbaum had no duty to disclose information; that the obligation to disclose material facts rested upon the Vanounous; and that Tannenbaum's participation in the trick or scheme to conceal material facts had to have the effect of causing the Vanounous to fail to discharge that duty. Accordingly, we conclude that the district court did not commit plain error.

We have considered Tannenbaum's remaining contentions and find them to be without merit.

## CONCLUSION

The judgment of the district court is in all respects affirmed.