07-2299-pr
*Abel Ortiz v. N.Y.S. Parole in Bronx, N.Y.*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2008

(Argued: April 20, 2009                                    Decided: November 10, 2009)

Docket No. 07-2299-pr

_____

ABEL ORTIZ,

*Petitioner-Appellant*,

-v.-

N.Y.S. PAROLE IN BRONX, N.Y.,

*Respondent-Appellee*.

_____

Before:                    KEARSE, SACK, and LIVINGSTON, *Circuit Judges*.

_____

Petitioner-Appellant seeks federal habeas review of his convictions for first degree riot and

second degree assault under New York law, which were upheld on direct appeal. *See People v.*

*Ortiz*, 777 N.Y.S.2d 640, 640 (N.Y. App. Div. 1st Dep't 2004). The United States District Court for

the Southern District of New York (Preska, J.) denied his request for a writ of habeas corpus. On

appeal, Petitioner-Appellant claims that the New York courts' interpretation of the riot statute, N.Y.

1

Penal Law § 240.06, deprived him of the right to fair notice under the Due Process Clause of the Fourteenth Amendment. We find that the New York courts' rejection of Petitioner-Appellant's due process claim and, specifically, his contention that the law did not "ma[ke] it reasonably clear at the relevant time that [his] conduct was criminal," *Ponnapula v. Spitzer*, 297 F.3d 172, 183 (2d Cir. 2002) (quoting *United States v. Lanier*, 520 U.S. 259, 267 (1997)) (internal quotation marks omitted), was not "an unreasonable application of . . . clearly established Federal law." 28 U.S.C. § 2254(d)(1). Accordingly, the district court appropriately denied Petitioner-Appellant's request for the writ.

Affirmed.

_____

SUSAN D. FITZPATRICK, Law Offices of Susan D. Fitzpatrick, Esq., Red Hook, N.Y., *for Petitioner-Appellant*.

JODI A. DANZIG, Assistant Attorney General (BARBARA D. UNDERWOOD, Solicitor General, ROSEANN B. MacKECHNIE, Deputy Solicitor General for Criminal Matters, *of counsel*), for ANDREW M. CUOMO, Attorney General of the State of New York, N.Y., *for Respondent-Appellee*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Petitioner Abel Ortiz ("Ortiz") appeals from the decision of the United States District Court for the Southern District of New York (Preska, J.), denying his application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. After a jury trial in New York State Supreme Court, New York County (Fried, J.), Ortiz was convicted of seven counts of riot in the first degree, in violation of N.Y.

Penal Law § 240.06, and seven counts of assault in the second degree, in violation of N.Y. Penal Law § 120.05(6). On appeal to this Court, Ortiz claims that the district court erred in denying his petition because the New York courts' interpretation of the New York riot statute, N.Y. Penal Law § 240.06, deprived him of the right to fair notice under the Due Process Clause of the Fourteenth Amendment. *See Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008) ("[A] conviction is invalid under the Due Process Clause if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited . . . ." (quoting *United States v. Williams*, 128 S. Ct. 1830, 1845 (2008)) (internal quotation marks omitted)). We affirm the judgment of the district court.

**BACKGROUND**

On June 11, 2000, following the Puerto Rican Day Parade, a large crowd of young men gathered near an entrance to Central Park at Central Park South and Sixth Avenue. While entering and exiting the park at that location, women were surrounded by groups of men, who sprayed them with water and groped them, both over and under their clothes. *See* Pet'r's App. Div. Br. 3. In some instances, the victims had their clothes torn off, exposing their breasts and vaginas. In some cases, the assailants used their fingers to penetrate the women's vaginas and anuses. Some victims were punched, kicked, and dragged along the ground. Others had their property stolen. *See* App. 12. The following is a recitation of the facts surrounding this riot shown at Ortiz's trial and set forth in the light most favorable to the prosecution. *See Ponnapula v. Spitzer*, 297 F.3d 172, 176 (2d Cir. 2002).

**I. Ortiz's Involvement in the Riot**

Several videotapes depicting scenes from the riot placed Ortiz amidst the crowd between 5:19 p.m and 5:47 p.m. At various times, Ortiz was clapping, smiling and pumping his arm. One video

3

recording captured him waving his arm at 5:40 p.m. and pointing down a road. Ortiz can be heard to tell the crowd, "Hey everybody be quiet, the bitch is over there down the road by the pole." Tr. 1217-18. As a result, other individuals pointed and "headed in that direction." Tr. 1219. Ortiz was also placed at the scene when a "whole bunch of people [were] rushing towards . . . a certain point." Tr. 1221. He is captured in a different video recording "reach[ing] back and grab[bing]" an unidentified woman from behind. Tr. 1227. Ortiz is shown "facing forward and reaching back and smiling and grabbing her breast." *Id.*

Video evidence also depicted Ortiz smiling and clapping at the scene of the riot when victims who testified at trial were also present. E.R. testified that she was surrounded by a large group of men, that several of them pulled down her top, exposing her breasts, and that they touched her breasts and buttock and penetrated her vagina until she was able to break free from the crowd. M.R. testified that a group of approximately twenty men surrounded her, doused her with water, and ripped her tank top. She alleged that Ortiz himself grabbed her breasts and then restrained her while others groped her body and penetrated her vagina and rectum with their fingers.[1] Video evidence placed Ortiz at the scene with both women.

Testifying on his own behalf, Ortiz acknowledged that men in the crowd were attacking women, including both E.R. and M.R. He further admitted that he was present in the crowd during these attacks. He testified, however, that he was trying to assist E.R. and M.R. and that he did not participate in any of the attacks. Ortiz acknowledged pointing out women to the men in the crowd and saying, "[S]hush, be qu[iet], look at them . . . bitch, she is over there by the pole." Tr. 2316. He

---

[1] The jury voted to acquit or failed to reach a verdict with regard to four counts charging Ortiz with the sexual abuse of M.R. in violation of N.Y. Penal Law § 130.65(1).

4

testified, however, that he made the comment not to encourage further incidents but to divert rioters from a woman under threat of attack. Finally, Ortiz testified that at 5:47 p.m. he "noticed [the situation was] getting out of control," and he left the park. Tr. 2225.

Twenty other women testified that they were molested by crowds of men in ways similar to the attacks on E.R. and M.R. Some of these victims were attacked before Ortiz allegedly left the scene. For example, Ortiz conceded in his brief to the Appellate Division that video evidence placed him at the scene when K.H. and R.A.L. were attacked. *See* Pet'r's App. Div. Br. 12-13. K.H. testified that, as she was exiting the park at around 5:30 or 5:45 p.m., a group of approximately twenty to thirty men surrounded her and her companions, dousing them with water. Approximately five men grabbed K.H.'s breasts, clothing, and buttocks, and she fell to the ground, whereupon more men grabbed her exposed breasts. As K.H. escaped from the crowd, yet additional men grabbed her breasts and buttocks. R.A.L., a friend of K.H. and a companion of hers that day, testified that she was separated from K.H. and her other friends by the same large group of men. The crowd attempted to remove R.A.L.'s clothing, and at one point her shirt was pulled down and her breasts exposed. R.A.L.'s breasts and buttocks were groped multiple times over her clothing.

The first degree riot counts lodged against Ortiz required the State to establish, among other things, that "a person other than one of the [riot] participants suffer[ed] physical injury." N.Y. Penal Law § 240.06 (McKinney 2000). Of the seven victims named in the counts charging Ortiz with first degree riot, five testified that they were attacked subsequent to Ortiz's claimed time of departure. For example, Y.T. and S.T., newlyweds honeymooning in the United States, exited Central Park around 6:00 p.m. Y.T. testified that twenty to forty men surrounded them and sprayed them with water. A group of men threw him to the ground and kept him there, while others surrounded S.T.

5

S.T. testified that she was surrounded by men, pushed to the ground, and that she had her skirt and underwear removed. They touched her breasts and vagina. She suffered injuries, including scratches above her chest and a laceration near her vagina. J.D., also named in a riot count, was attacked sometime after 6:00 p.m. Her assailants ripped off her shirt and took a necklace she was wearing. During the fracas, J.D., then fifteen years old, sprained her knee and suffered bruises and scratches. Similarly, H.I., a college student visiting from England, was attacked twice between 6:05 p.m. and 6:30 p.m. She was punched in the face as assailants removed her shirt, touched her exposed breast, and reached inside her shorts to penetrate her anus and vagina. H.I. lost about $200 in cash and a bank card when assailants left with her handbag.

Based on the time estimates they provided, two of the victims named in the first degree riot counts may have been attacked either before or after 5:47 p.m., when Ortiz claims to have left the park. M.T. stated that more than forty men surrounded her, and that many touched her breasts, buttocks, and vaginal area, both over and under her clothing, sometime between 5:30 p.m. and 6:00 p.m. She suffered a cut to her back and received bruises on her arms and legs and scratches on her chest, neck, and buttocks as a result of the assault. S.W., a young mother from New Jersey, was attacked sometime between 5:00 p.m. and 6:15 p.m. She was kicked in the shin when, surrounded by a crowd of men who were touching her breasts and buttocks, she tried to push away one who was attempting to put his hand inside her pants. S.W. suffered a bruised and swollen leg.

**II. State Court Proceedings**

Ortiz was indicted for seven counts of riot in the first degree, in violation of N.Y. Penal Law § 240.06. He was also charged with seven counts of assault in the second degree, in violation of N.Y. Penal Law § 120.05(6), for causing injury in furtherance of the commission of a felony, to wit,

6

riot in the first degree. Finally, Ortiz was indicted for four counts of sexual abuse in the first degree, in violation of N.Y. Penal Law § 130.65(1), for sexual contact with M.R.

The scope of Ortiz's criminal liability for actions taken by rioters *after* his alleged departure was an issue during his trial. In particular, the defense argued at the charge conference that "in this particular situation, I think what we have to say, is when somebody is no longer there they are not responsible . . . ." Tr. 2757. The court disagreed, stating that "[w]hat I think I will say is . . . once one joins a riot, that person remains criminally liable for the conduct set in motion until he withdraws . . . ." Tr. 2764.[2] When instructing the jury on this issue, the court first read the text of the riot statute, which, at the time of Ortiz's conduct, stated as follows:

> A person is guilty of riot in the first degree when (a) simultaneously with ten or more other persons he engages in tumultouous [sic] and violent conduct and thereby intentionally or recklessly causes or creates a grave risk of causing public alarm, and (b) in the course of and as a result of such conduct, a person other than one of the participants suffers physical injury or substantial property damage occurs.

N.Y. Penal Law § 240.06 (McKinney 2000); *see also* Tr. 3117-18.[3]

The court then continued:

> Furthermore, one who participates in a riot is responsible for the violence of any committed during the entire riot. This is because the law punishes joint behavior. And one who joins a riot takes it as one finds it. . . . [M]erely leaving the riot scene would not end one[']s criminal responsibility for someone's actions. That's because the law punishes a joint action and a participant is responsible for the consequences of the group[']s joint action or the conduct set in motion by the riot regardless of whether that person was actually there or present at the precise moment of the

---

[2] The court instructed that simply leaving the riot is insufficient to withdraw. *See* Tr. 3120 (instructing that "once one joins a riot, [a] person remains criminally liable for the conduct set in motion until he makes substantial effort to end the conduct").

[3] The riot statute was amended in 2005 in ways not pertinent to the present appeal. *See* 2005 N.Y. Laws c. 294. All references to the statute here are to the version as it existed at the time of Ortiz's conduct.

conduct. Moreover, once one joins a riot, that person remains criminally liable for the conduct set in motion until he makes substantial effort to end the conduct.

Tr. 3119-3120. In short, the court's instructions made clear that, absent substantial efforts to end the riot, Ortiz was criminally liable for injuries inflicted by the continuing riot subsequent to the time that he testified he had departed from the scene.

After deliberating, on April 2, 2001, the jury convicted Ortiz of all seven counts of riot in the first degree and assault in the second degree. Ortiz was acquitted of three counts of sexual abuse of M.R., regarding contact with her buttocks, vagina and anus, and the jury was unable to reach a verdict on the fourth, regarding her breasts. He received concurrent sentences of five years on the assault convictions and one and one third to four years for the riot convictions.

Ortiz appealed his convictions to the Appellate Division's First Department, making two arguments that are relevant here. First, Ortiz argued that his convictions were supported by insufficient evidence because there was not enough proof to show that he was taking part in the riot at the time when any of the women named in the riot counts received injury. Second, Ortiz argued that, because the jury instructions imposed liability for actions taken by members of the continuing riot after he left the scene, the instructions were so fundamentally flawed as to deny him a fair trial under the Fourteenth Amendment. In particular, Ortiz argued that the scope of criminal liability articulated in the jury instructions was "completely in derogation of the plain terms of the statute, the legislative intent and the law's purposes." Pet'r's App. Div. Br. 46-47.

The Appellate Division rejected Ortiz's arguments and affirmed his convictions:

> The verdict was based on legally sufficient evidence. Contrary to defendant's argument, the People were not required to prove that he was still present at, or participating in, the riot at the moment of the victims' injuries. The riot statute permits a riot participant to be held criminally liable for the acts of other participants, in the course of the same continuing riot, even after his or her own participation may

8

have terminated. Similarly, the court's instruction in this regard was correct.

*People v. Ortiz*, 777 N.Y.S.2d 640, 640 (N.Y. App. Div. 1st Dep't 2004) (citations omitted). The New York Court of Appeals denied Ortiz leave to appeal. *People v. Ortiz*, 820 N.E.2d 299 (N.Y. 2004).

**III. Federal Court Proceedings**

On January 20, 2006, Ortiz filed a *pro se* petition for a writ of habeas corpus in the Southern District of New York. In the petition, he reiterated the same arguments he made to the Appellate Division. On February 5, 2007, Magistrate Judge Ronald L. Ellis issued a report and recommendation denying Ortiz's claims. Judge Ellis found, *inter alia*, that the jury instructions did not deprive Ortiz of the right to a fair trial and that his convictions were supported by sufficient evidence. Specifically, Judge Ellis found that "the trial court's instructions on liability for the actions of other riot participants was [not] a misstatement of state law," App. at 16, and that the Appellate Division's interpretation of the riot statute was not "so egregious as to be fundamentally unfair and thus violate . . . the fair notice aspect of the Due Process Clause," *id.* at 17 (quoting *Ponnapula v. Spitzer*, 297 F.3d 172, 182 n.2 (2d Cir. 2002)) (internal quotation marks omitted). On February 28, 2007, the district court adopted Judge Ellis's report and recommendation in full, denied Ortiz's petition, and declined to issue a certificate of appealability.

Ortiz moved for a certificate of appealability from this Court *pro se*, and on January 23, 2008, we granted the certificate and appointed counsel. We instructed counsel "to brief the issue of whether the application of New York Penal Law § 240.06 to Ortiz, who was absent at the time of the assaults underlying his conviction, violated his due process right to fair notice." App. at 5. Thus, our review is limited to Ortiz's claim that the state courts' interpretation of the New York riot statute deprived

him of the due process right to fair notice. *See Armienti v. United States*, 234 F.3d 820, 824 (2d Cir. 2000) ("We will not address a claim not included in the certificate of appealability."); 28 U.S.C. § 2253(c)(1) ("Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court.").

**DISCUSSION**

**I. Standard of Review**

We review a district court's denial of a petition for a writ of habeas corpus *de novo*. *See, e.g.*, *Anderson v. Miller*, 346 F.3d 315, 324 (2d Cir. 2003). The Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), establishes a "deferential standard of review" of a state court's adjudication of the merits of a petitioner's claim. *Wilson v. Mazzuca*, 570 F.3d 490, 499 (2d Cir. 2009) (quoting *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009)). Under AEDPA, we may not issue a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Because the Appellate Division rejected Ortiz's due process challenge to the jury instructions construing N.Y. Penal Law § 240.06, and thereby implicitly rejected Ortiz's fair notice claim, that claim has been "adjudicated on the merits." *Id.*; *see Dallio v. Spitzer*, 343 F.3d 553, 560 (2d Cir. 2003) ("Our precedents instruct that to qualify as an adjudication 'on the merits,' a state court decision need not mention a particular argument or explain the reasons for rejecting it."). Thus, as agreed by both parties, the AEDPA standard of review applies.

"Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief": where the relevant state-court decision was either (1) "*contrary to . . .* clearly established federal law, as determined by the Supreme Court" or (2) "*involved an unreasonable application of . . .* clearly established Federal law, as determined by the Supreme Court." *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000) (quoting 28 U.S.C. § 2254(d)(1)). We have previously stated that a "state court decision is 'contrary to' existing Supreme Court precedent (i) when it applies a rule of law 'that contradicts the governing law set forth in' the Supreme Court's cases, or (ii) when it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent.'" *Lurie v. Wittner*, 228 F.3d 113, 127 (2d Cir. 2000) (alterations in original) (citations omitted) (quoting *Williams*, 529 U.S. at 405-06). Ortiz does not – and could not – contend that the New York courts stated the fair notice standard in a way that contradicts Supreme Court precedent; moreover, he mentions no case with materially indistinguishable facts. Thus, the "contrary to" clause of Section 2254(d)(1) is not at issue.

Instead, Ortiz's appeal is predicated upon the "unreasonable application" prong of Section 2254(d)(1). It is "well-established in [this] [C]ircuit that the objectively unreasonable standard of § 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." *Lynn v. Bliden*, 443 F.3d 238, 246 (2d Cir. 2006) (alterations in original) (quoting *Cotto v. Herbert*, 331 F.3d 217, 248 (2d Cir. 2003)) (internal quotation marks omitted). Thus, we may not issue the writ simply because we conclude in our independent judgment "that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must *also* be unreasonable." *Lurie*, 228 F.3d at 129 (emphasis

11

added) (quoting *Williams*, 529 U.S. at 411) ; *see also Policano v. Herbert*, 507 F.3d 111, 115 (2d Cir. 2007) ("As we have interpreted [the AEDPA] standard, we decide not whether the state court *correctly* interpreted the doctrine of federal law on which the claim is predicated, but rather whether the state court's interpretation was *unreasonable* in light of the holdings of the United States Supreme Court at the time."(emphasis added) (quoting *Brown v. Greiner*, 409 F.3d 523, 533 (2d Cir. 2005)) (internal quotation marks omitted)).

The Supreme Court has instructed that the "unreasonable application" standard is sensitive to the generality of the legal rule at issue:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. *The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.*

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (emphasis added); *see also Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009) ("[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied the standard."). In *Yarborough*, the Court considered the legal standard for determining whether a suspect is in "custody" for purposes of *Miranda v. Arizona*, 384 U.S. 436 (1966), i.e., "given [the circumstances surrounding an interrogation], would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Yarborough*, 541 U.S. at 663 (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The Court found that because "the custody test is general," the state court's application of federal law need only "fit[] within the matrix of [the Supreme]

Court's prior decisions." *Id.* at 665.

The due process right to fair notice is a similarly general rule of law that "demand[s] a substantial element of judgment," *id.* at 664, and can hardly "be implemented . . . mechanically," *Brisco v. Ercole*, 565 F.3d 80, 89 (2d Cir. 2009). As stated by the Supreme Court, the "touchstone" of the "fair warning requirement" is "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 266-67 (1997). Thus, based on the nature of the rule at hand, we owe the New York courts "more leeway" in "reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664; s*ee also Brisco*, 565 F.3d at 89 ("Our determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question."); *Serrano v. Fischer*, 412 F.3d 292, 297 (2d Cir. 2005) ("[T]he range of judgments that can be deemed 'reasonable' may vary with the nature of the rule in question. Thus, while very specific rules may not permit much leeway in their interpretation the same is not true of more general rules . . . ." (citation omitted)); *Locke v. Cattell,* 476 F.3d 46, 51 (1st Cir. 2007) ("[W]here the legal rule is general and review of the state court decision is under the deferential standard of § 2254(d)(1), state courts have substantial leeway in reaching a reasonable decision." (citing *Yarborough*, 541 U.S. at 665)).

**II. Merits**

**A. Fair Notice Principles**

At the outset, it is helpful to set aside two issues that are not before the Court. First, it is not for us to consider whether the New York courts' construction of N.Y. Penal Law § 240.06 – under which a rioter is responsible for acts committed by others after he leaves the riot – is correct. "[I]t

13

is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("This Court . . . repeatedly has held that state courts are the ultimate expositors of state law."). Rather, our task is limited to the determination of whether the New York courts' conclusion that the riot statute as construed did not deprive Ortiz of the right to fair notice under the Due Process Clause was reasonable.[4]

Second, we are not confronted with a situation where, in interpreting § 240.06, the Appellate Division *expanded* the scope of criminal liability beyond the contours of previous judicial interpretation. This is not a case like *Bouie v. City of Columbia*, 378 U.S. 347 (1964), in which the Supreme Court held that petitioners were denied due process when the South Carolina Supreme Court interpreted a criminal trespass statute to cover "the act of remaining on the premises of another after receiving notice to leave," *id.* at 350, and applied that interpretation to the defendants' conduct even though South Carolina case law up to that period had "emphasized that proof of notice before entry was necessary to sustain a conviction," *id.* at 356. Nor is it a case like *Rogers v. Tennessee*, 532 U.S. 451 (2001), where the Supreme Court considered whether the Tennessee Supreme Court's repudiation of the common law year-and-a-day rule – which had required the death of the victim within a year to sustain a murder conviction – could be retroactively applied to a criminal defendant who committed his crime before this repudiation of the common law rule took place. *See id.* at 461

---

[4] It follows that Ortiz's invocation of the rule of lenity does not add anything to his fair notice argument. Because "the rule of lenity is a canon of construction rather than a federal law," and the construction of state law is left to the state courts, we have previously indicated that "federal courts cannot vacate a state conviction on lenity grounds unless a state criminal statute (i) is unconstitutionally vague, or (ii) otherwise fails to give constitutionally required 'fair notice.'" *Lurie*, 228 F.3d at 126.

14

(holding that the "retroactive application of judicial interpretations of criminal statutes" violates the due process right to fair notice only when such application is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue" (quoting *Bouie*, 378 U.S. at 354)).

Unlike *Bouie* and *Rogers*, this case does not involve any expansion in the scope of criminal liability beyond that indicated by previous decisional law. Until Ortiz's case, the New York courts had not addressed the issue whether defendants can be responsible under the riot statute for physical injuries or substantial property damage that may occur after they have left the scene of a riot in which they have participated. Thus, we need not consider whether the New York courts have worked an impermissible retroactive *change* in the law, violating due process by adopting a new judicial interpretation that was "unexpected and indefensible" by reference to what courts had said before. *See Rogers*, 532 U.S. at 461; *see also id*. at 471 (Scalia, J., dissenting) (noting "the crucial difference between simply applying a law to a new set of circumstances and changing the law that has previously been applied to the very circumstances before the court"). Instead, we consider simply whether it was reasonable for the Appellate Division to find in upholding his conviction that § 240.06 itself provided Ortiz fair notice of the construction the court adopted, or whether this construction was so unreasonably novel as to deprive Ortiz of fair warning that his conduct was prohibited.

The "basic and general principle of fair warning" was set forth by the Supreme Court as follows: "[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Rogers*, 532 U.S. at 459 (quoting *Lanier*, 520 U.S. at 266) (internal quotation marks

15

omitted). The fair warning principle is violated "[i]f a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Id.* at 457 (quoting *Bouie*, 378 U.S. at 354) (internal quotation marks omitted). Second Circuit precedent on the meaning of an "unexpected and indefensible" interpretation of state law is both clear and longstanding: "The Due Process Clause requires only that the law give sufficient warning that men may conduct themselves so as to avoid that which is forbidden, and thus not lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." *Rubin v. Garvin*, 544 F.3d 461, 469 (2d Cir. 2008) (quoting *United States v. Herrera*, 584 F.2d 1137, 1149 (2d Cir. 1978)) (internal quotation marks omitted); *see also United States v. Tannenbaum*, 934 F.2d 8, 11 (2d Cir. 1991) (same). Furthermore, the unavoidable ambiguities of language do not transform every circumstance in which judicial construction is necessary into a violation of the fair notice requirement: "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Colten v. Kentucky*, 407 U.S. 104, 110 (1972); *see also Herrera*, 584 F.2d at 1149 ("[The] prohibition against excessive vagueness does not . . . invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for in most English words and phrases there lurk uncertainties." (quoting *Robinson v. United States*, 324 U.S. 282, 286 (1945)) (internal quotation marks omitted)).

16

**B. Application**

At the time of Ortiz's conduct, the New York riot statute provided as follows:

> A person is guilty of riot in the first degree when (a) simultaneously with ten or more other persons he engages in tumultouous [sic] and violent conduct and thereby intentionally or recklessly causes or creates a grave risk of causing public alarm, and (b) in the course of and as a result of such conduct, a person other than one of the participants suffers physical injury or substantial property damage occurs.

N.Y. Penal Law § 240.06 (2000). The Appellate Division held that "[t]he riot statute permits a riot participant to be held criminally liable for the acts of other participants, in the course of the same continuing riot, even after his or her own participation may have terminated." *People v. Ortiz*, 777 N.Y.S. 2d 640, 640 (N.Y. App. Div. 1st Dep't 2004) (citations omitted). Although this was the first time the New York courts addressed the issue, we have made clear that "[d]ue process is not . . . violated simply because the issue is a matter of first impression." *Ponnapula v. Spitzer*, 297 F.3d 172, 183 (2d Cir. 2002); *see also United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) ("The claimed novelty of this prosecution does not help [defendant's fair notice argument], for it is immaterial that there is no litigated fact pattern precisely in point." (quoting *United States v. Ingredient Tech. Corp.*, 698 F.2d 88, 96 (2d Cir. 1983)) (internal quotation marks omitted)).

Ortiz argues that the Appellate Division's interpretation of § 240.06 is at odds with the statute's plain meaning. He contends that the "conduct" in clause (b) – conduct that "in the course of and as a result of . . . a person . . . suffers physical injury" – must be "riotous conduct committed by 11 people, including the accused." Appellant's Br. 17. On this view, the "conduct" in clause (b) refers to the *entirety* of clause (a) – i.e., "tumultuous and violent conduct" that the defendant "engages in" "simultaneously with ten or more other persons." N.Y. Penal Law § 240.06(a). If the injuries covered by clause (b) are limited to those injuries sustained "in the course and as a result of"

17

conduct that the defendant engages in simultaneously with at least ten individuals, the defendant must be present when the injuries occur.

This is not, however, the only reading of the statute that is consistent with its language. The "conduct" in clause (b) can be read to refer to the "tumultuous and violent conduct" of the same continuing riot, and not conduct that the defendant engages in "simultaneously with ten or more other persons." Indeed, nothing in the language of the statute requires that the "conduct" in clause (b) incorporate the totality of the language in clause (a). Clause (b) does not state "in the course of and as a result of *that person's* conduct," or "in the course of and as a result of *that simultaneous* conduct," both of which would necessarily refer to the continuing actions of the defendant. Instead, § 240.06(b) uses the phrase "in the course of and as a result of *such* conduct" – a phrase that does not specify the precise conduct in clause (a) to which it refers. *See* Webster's Third New International Dictionary Unabridged 2283 (2002) (defining "such," in pertinent part, as "previously characterized or specified"). Because of the lack of particularization in the phrase "such conduct," that phrase can, consistent with the language of § 240.06, include "tumultuous and violent conduct" that continues after a riot participant has left the scene. This was the Appellate Division's reading of the statute. *See Ortiz*, 777 N.Y.S. 2d at 640 (holding a defendant criminally liable for injuries sustained "in the course of the same continuing riot"). We think this is at the very least a reasonable construction of the statute's text. *See Ponnapula*, 297 F.3d at 184.

The Appellate Division's interpretation, moreover, is consistent with the New York courts' interpretation of other criminal provisions prior to its decision in Ortiz's case. Several New York statutes expressly punish defendants for injuries that they or their co-participants inflict during their crime "or in immediate flight therefrom." *See, e.g.*, N.Y. Penal Law § 120.05(6) ("A person is guilty

18

of assault in the second degree when . . . [i]n the course of and in furtherance of the commission or attempted commission of a felony . . . or of immediate flight therefrom, he, or another participant if there be any, causes physical injury to a person other than one of the participants."). These statutes do not require, however, that injury be inflicted during the *defendant's* immediate flight. They have been construed to punish defendants for injuries occurring during their co-participants' immediate flight, even if the defendant's flight has already ended.

For example, in *People v. Spivey*, 81 N.Y.2d 356 (1993), the defendant was convicted of felony assault based on injuries inflicted on an officer by individuals fleeing from the scene of a robbery they had perpetrated with Spivey. *Id.* at 359. At the time of the injury, Spivey had already been arrested and was being detained in a different location. *Id.* The Court of Appeals nevertheless upheld his felony assault conviction, ruling that "the defendant need not be physically present at the scene of the assault." *Id.* at 361. Importantly, the Appellate Division's decision in Ortiz's case specifically relies on *Spivey* to justify its similar construction of the riot statute. *See Ortiz*, 777 N.Y.S.2d at 640.

We need not consider whether the Appellate Division's interpretation of § 240.06 is the correct one, or even whether it was "unexpected and indefensible" in light of the plain language of the statute. *See Rogers*, 532 U.S. at 457. We need only determine whether the Appellate Division's conclusion that its interpretation did not violate due process – that it was *not* so unexpected and indefensible as to deprive Ortiz of fair notice – was an unreasonable application of due process principles. 28 U.S.C. § 2254(d)(1). Given the leeway we owe New York courts in applying the fair notice requirement, a general legal standard, *see Yarborough*, 541 U.S. at 664, and given that the Appellate Division's construction of § 240.06 is at the very least consistent with the provision's

language and analogous case law, we find the New York courts' conclusion that § 240.06 provided "sufficient warning that men [could] conduct themselves so as to avoid that which is forbidden," *Rubin*, 544 F.3d at 469, was not an unreasonable one. Under the deferential AEDPA standard of review, we cannot say that Ortiz was given "no reason even to suspect that his conduct might be within [the] scope" of § 240.06. *Id.* Accordingly, we conclude that Ortiz's fair notice claim lacks merit.

**III. Conclusion**

For the foregoing reasons, the judgment of the district court is AFFIRMED.